# Commonwealth of Pennsylvania *v.* James Farrell, Appellant.

*Evidence—Expert witnesses—Opinion of witness.*

Two things must concur to justify the admission of an expert witness · first, the subject under examination must be one that requires that the court and jury have the aid of knowledge or experience such as men not specially skilled do not have, and such therefore as cannot be obtained from ordinary witnesses; second, the witness called as an expert must possess the knowledge, the skill or experience needed to inform and

guide the court and jury in the particular case. Upon such a question such a witness may be called and may testify not merely to facts, but to conclusions from the facts.

*Criminal law—Murder—Evidence—Expert testimony.*

On the trial of an indictment for murder, it appeared that after the arrest of the prisoner his room was searched, and an old, worthless pocketbook was found in his bed. The murder had been committed six months prior to the prisoner's arrest. Evidence was offered to show that the pocketbook had been rudely mended with thread of the usual size and character. It was sought to connect this pocketbook with the deceased by showing that he had a smaller pocketbook which had been mended in a similar manner. For this purpose a witness was put upon the stand as an expert to prove that the repairs upon each pocketbook had been made by the same person, with the same thread. The witness declined to say that the repairs on both were made by the same person. The thread used had been the same in number on both, as he thought, but it was a common number, and was not a certain basis for an opinion that the work had been done by the same person. This evidence was submitted to the jury, with the instructions that if the pocketbook found in the prisoner's bed was one of those which the murdered man owned and had in his possession at the time of his death, it would be a strong presumption of the defendant's guilt. *Held*, (1) that there was no question of art or skill raised by the evidence upon which special knowledge was needed; (2) that the witness did not show himself possessed of expert knowledge, if it had been necessary; (3) that the jury should have been instructed that it did not follow from the evidence that the prisoner either took the pocketbook from the murdered man or placed it where it was found; (4) that the credibility of the story was for the jury, and they should first have determined its value.

The question as to the length of time after death when rigor mortis may be expected to set in is a question for expert medical testimony, and cannot be answered by an undertaker's assistant, who has no medical knowledge, who states that he is not an expert on the subject and whose only experience has been in preparing dead bodies for burial without his attention being specially directed to the subject.

*Criminal law—Murder—Evidence—Threat.*

In the trial of an indictment for murder a threat to rob the deceased is admissible to show knowledge or motive on the part of the prisoner, but there is no such legal presumption that the threat will be executed as relieves the commonwealth from the duty of proving the fact it alleges, viz: the participation of the prisoner in the robbery and killing of the deceased.

*Criminal law—Murder—Evidence of detectives—Cross-examination.*

On the trial of an indictment for murder where it appears that detectives had been employed by the county to work up the case against the prisoner, they, for the purpose of showing their interest or feeling in the cause, may be asked upon cross-examination to state the general charac-

ter of the contract with the county, and how the pay of the agency was to be adjusted.

Argued Jan. 25, 1898. Appeal, No. 442, Jan. T., 1898, by defendant, from judgment of O. & T. Blair Co., March T., 1896, No. 4, on verdict of guilty of murder in the first degree. Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Reversed.

Indictment for murder. Before BELL, P. J.

The circumstances connected with the killing of Henry Bonnecke are fully reported in Commonwealth v. Wilson, 186 Pa. 1.

Michael Poet, called on the part of the commonwealth, testified as follows : " Q. Can you determine from your experience, as you have narrated it, how long a body has been dead or about how long? " Objected to.

By the Court: " Q. Have you had some experience with dead bodies, regard being had to the time that death occurred and the time when you found them? A. Yes, sir ; I have also been in the undertaking business a number of years, and when I was in the army I had charge of assorting the dead from the general hospital at Hilton Head, South Carolina."

By Mr. Henderson, counsel for defendant: " Q. Have you studied any works on medicine? A. No, sir. Q. Have you never read any works at all on it? A. No, sir ; not any more than what a person would read in books, papers, etc. Q. You don't claim to be an expert? A. No, sir."

By Mr. Hammond, district attorney: " Q. Can you determine from your experience as you have narrated it how long a body has been dead, or about how long, when you examine it? A. Well, I cannot answer that question fully ; if a person is killed or dies, from six to eight hours (objected to). That is my experience in handling corpses.

By the Court: I think we will allow the question to be asked. The objection is overruled and a bill is sealed for the defendant.

By Mr. Hammond : " Q. How long had Henry Bonnecke been dead, in your judgment, when you found him? A. Well, I think he had been dead from some time during Saturday night ; that would be on the 6th day of April." [2]

The court refused to strike out the testimony of Michael Poet. Bill sealed. [3].

The commonwealth offered to prove by Joseph Peddicord that James Farrell, the defendant, Frank Wilson and William Doran associated together prior to the murder of Henry Bonnecke, in the year 1894, and conspired to rob Henry Bonnecke of his money ; and that after said conspiracy, the defendant and the witness assaulted said Bonnecke in his house and attempted to rob him ; and that said defendant, after said attempt to rob him, the said Henry Bonnecke, and on the evening of the same day, to wit: February 21, 1895, proposed to witness on the stand that they renew their attack upon said Bonnecke for the purpose of robbing him ; that the witness declined and that then the defendant swore he would get Bonnecke's money yet if he had to kill him.

The offer was objected to for the following reasons :

1. Because James Farrell, the defendant, is now on trial for murder, which is a separate and distinct offense, and entirely independent of the other offense proposed to be proved.

2. The offer is to prove that the defendant, James Farrell, Frank Wilson and William Doran associated together in the year 1894 and conspired to rob Henry Bonnecke of his money ; and in pursuance of said conspiracy, the defendant and witness assaulted said Bonnecke at his house and attempted to rob him on February 21, 1895.

3. This indictment is against the defendant alone, and there is no offer to prove that either Wilson or Doran took any part or made any attempt to rob Bonnecke on February 21, 1895.

5. Joseph Peddicord, being a self-confessed accomplice, is incompetent as a witness to prove the facts in the commonwealth's offer.

6. He is further incompetent for the reason that he is a convicted felon, and so shown by the records of this court. The witness is incompetent and the evidence irrelevant and inadmissible.

By the Court: June 23, 1896, objection overruled and evidence admitted.   Bill sealed. [4]

William Goetz, called on the part of the commonwealth, testified as follows :

" Q. State whether you are a judge of sewing ?   A. Well, I know whether a garment is sewed correctly.   Q. Would your experience and skill enable you to determine whether two dif-

ferent pieces of sewing were sewed with the same thread and by the same hand? A. I know if it was sewed by the same thread but not positively that it was sewed by the same hand; you could tell the same thread. Q. (Showing pocketbook.) Look at these pocketbooks and examine the sewing on this one there and the sewing on this one here and say whether the sewing was done by the same thread." Objected to.

By the Court: The objection is overruled and a bill sealed for the defendant. [5]

Daniel McSweeny, a witness for the commonwealth, on the stand, having stated that he came to Altoona, Pa., on April 16, 1895, to investigate this case, the defendant's counsel proposed to ask him on cross-examination who employed him to come here; whether he came under a contract for fees, expenses, etc., and what the contract was; how long the agency with which he is connected, and its detectives have been employed on this case; how many men they engaged upon it; what is the amount of their bill and by whom to be paid; and what are the nature, amount and kind of services rendered; with whom the contract was made; if he or his firm employed private counsel to prosecute this case; and if so, how and by whom is he to be paid.

The witness having testified that he had been employed by the government and had left their employ, the counsel for the defense proposed to ask him why he left the services of the government, and whether he was not discharged for improper conduct.

This for the purpose of affecting the witness's credibility.

The commonwealth objected to the questions as irrelevant to the issue and immaterial.

By the Court: We have already admitted part of the offer of evidence or part of the questions proposed in the offer and we now reject that part of the offer which seeks to prove this particular, as to the amount of the witnesses' bill or the bill of the detective agency of which the witness is a member.

We also reject the question as to how much, if anything, is to be paid any private counsel employed; but we will allow the question to be put as to whether any private counsel has been employed by the detective agency to assist on the trial of this case:

Cross-examination:

" Q. Do you know how much you paid the men? A. That is a personal question which I refuse to answer."

Objected to, objection sustained and a bill sealed for the defendant.

" Q. How much have you charged the county with? "

Objected to, objection sustained and a bill sealed for the defendant.

" Q. How much money have you received from the county upon this contract? "

Objected to, objection sustained and a bill sealed for the defendant. [13]

The court charged in part as follows:

[The commonwealth further claims that, regard being had to the absence of rigor mortis, or the stiffness of death, and the alleged fresh condition of the blood found near the head, together with the further alleged fact (as claimed by the prosecution but denied by the defense) that respiration was entirely shut off by the handkerchief in the mouth and the cloth around the face, Bonnecke was murdered on the night preceding the day on which he was found, to wit: on the night of April 6-7, 1895.] [15]

[Starting out with this claim or assumption, the commonwealth offers evidence which, it is alleged, points to the guilt of James Farrell, the defendant, and proves that he is the murderer, or one of the murderers, of Henry Bonnecke. Threats made by Farrell after his unsuccessful attempt to rob Bonnecke on February 21, 1895, as testified to by Joseph Peddicord, are relied on by the commonwealth as part of such proof. In this connection, however, I would caution you not to attach undue importance to the fact that Farrell did attack Bonnecke on February 21, 1895. Such fact was properly admissible in evidence as part of the res gestæ, or surrounding circumstances, of Peddicord's testimony, and as a circumstance which might point to the probability of Farrell's renewing the attempt, but you must not allow it to unduly prejudice you against the defendant. Farrell is now on trial, not for the attempt to rob Bonnecke on February 21, 1895, but for the killing of Bonnecke in April of that year. The occurrence of February 21, 1895, is

only to be considered by you in so far as it may throw any light, if it does throw any light, on this occurrence of April following, namely, the killing of Bonnecke. If it throws no such light on said occurrence of April following it, that is, the attempt made in February, it is to be wholly disregarded and lost sight of by you.] [16]

Further, the commonwealth avers and has offered evidence tending, as it claims, to prove that Farrell, on receiving his first pay at Allequippa, Beaver county, Pennsylvania, whither he had gone after his attempt in February, on Saturday, April 6, 1895, took the noon train on the Pittsburg and Lake Erie Railroad for Pittsburg, and on that afternoon or evening came to Altoona, over the Pennsylvania Railroad. The commonwealth points to the testimony of Mr. Koelle and Miss Lindley, as showing that he was in Altoona on Saturday afternoon, and to the testimony of ex-Sergeant of Police, John M. Weakland, as proving—this is the claim of the commonwealth—that Farrell was in Altoona on the following afternoon, Sunday, April 7, 1895. It is further claimed by the prosecution that the alleged conversation, testified to by Miss Lindley between three men she saw on Sixteenth street, shows that Farrell was in Altoona on a guilty errand on the evening of April 6, 1895.

[A pocketbook was found in a bed in the house of James Donnelly, at Allequippa, a day or two after the arrest of Farrell in November, 1895. Farrell boarded with Donnelly, who was his brother-in-law, while he, Farrell, was in Allequippa. The commonwealth alleges that this pocketbook, so found, belonged to Henry Bonnecke, was stolen from him when he was killed and was concealed in that bed at Allequippa by Farrell. The question as to the ownership of this pocketbook, whether it was the pocketbook of Bonnecke, whether the sewing in the repairing of the pocketbook is similar or dissimilar to certain repairs in a certain pocketbook or pocketbooks found in Bonnecke's house after his death—these and similar questions arising about the pocketbook found at Allequippa are so exclusively questions of fact for the decision of a jury that I refrain from commenting further on the subject. You will have the various pocketbooks offered in evidence, in your jury room; you will examine them and consider the questions involved, and the arguments of the respective counsel pro and con, viewed in the light of the evi-

dence, and reviewed by your own examination of the pocket-books. If the pocketbook in question, to wit: the pocketbook found in the bed at Allequippa, was the pocketbook of Henry Bonnecke, and was stolen at the time of his death, in April, 1895, and was taken to Allequippa by Farrell, and was concealed in his bed, then there would be a strong presumption arising from the possession of stolen property that Farrell was the robber or one of the robbers who stole said pocketbook; and, inferentially, it would strongly tend to show that he is guilty of being concerned in the death of Henry Bonnecke.] [17]   On the contrary, if you have a reasonable doubt as to whether this pocketbook ever belonged to Henry Bonnecke, you should dismiss the circumstance of the finding of the pocketbook from the case and allow it to have no weight against the defendant. From the foregoing facts and circumstances and from some other facts and circumstances, the commonwealth claims to have proved beyond any reasonable doubt that James Farrell, the defendant, killed or aided or assisted in the killing of Henry Bonnecke, and, therefore, should be found guilty.

The commonwealth having shown that Farrell was in Allequippa, Beaver county, Pennsylvania, at noon on Saturday, April 6, 1895, and it being physically impossible for him to have reached Altoona until about 7 o'clock on that evening if he came on fast freight, or not before 9 o'clock, if he came by passenger train, the defense claim very strenuously that he, Farrell, could not have been in any wise concerned in the alleged murder of Bonnecke, because the defense say the attack upon and robbing of said Bonnecke occurred prior to said Saturday evening, April 6, 1895; most probably, so the defense claim, on Thursday night, April 4, or Friday night, April 5. How is this, gentlemen? It is a question for you to decide on the evidence, and it is so exclusively a question of fact for the decision of the jury, that I refrain from commenting on the evidence, but refer the question to you for decision. If you have a reasonable doubt as to whether the attack on Henry Bonnecke, resulting in his death, occurred prior to Saturday evening, April 6, 1895, such doubt should operate to the acquittal of the defendant, and you should find him not guilty, as on the testimony of the commonwealth Farrell could not have reached Altoona prior to from 7 to 9 o'clock on said Saturday evening, April 6, 1895.

Furthermore, as part of the defense, the defendant takes the witness stand and testifies most positively that he is innocent and was in no wise concerned in the robbing of or killing of Henry Bonnecke in April, 1895. He testifies that he was in Allequippa on the afternoon of April 6, 1895, his first pay day there, and in the evening of that day went to Beaver and spent the night there, returning to Allequippa on Sunday morning, April 7, 1895. He has given a somewhat detailed account of his action on the afternoon, April 6, and that night, April 6-7, 1895. You are the judges of his credibility. On the one hand, it is claimed by the commonwealth that he has a strong motive to falsify, and that the fact that he brings no witness to corroborate him to any material extent, or to corroborate his alibi, is evidence that he is falsifying. On the other hand, it is claimed by his counsel that circumstances beyond his control prevent his calling his sister, Mrs. Donnelly, and her husband, in whose house he lived in Allequippa, to corroborate his story, and that it is unlikely that any one else about Allequippa could, after the expiration of some nine months, remember his whereabouts on April 6-7, 1895, as he was a comparative stranger in that place. It is further claimed by his counsel that at most he is but the unfortunate victim of some isolated, suspicious circumstances, which, all taken together, are not sufficient to warrant a jury in finding him guilty of the high crime of murder. These matters are all for your consideration and determination.

I have refrained from commenting on the testimony in this case, much less have I attempted to recapitulate or repeat it all, as I deem the questions to be solved to be almost exclusively questions of fact which it is the province of the jury, not the court, to decide; and the case has been most elaborately, carefully and ably argued pro and con by the respective counsel. You, gentlemen, however, will make a conscientious endeavor to keep before your minds, as you deliberate on your verdict, all the evidence, and give to each particle of it the weight to which 'it may be entitled. Some of the evidence may be conflicting; counsel for the commonwealth and for the defense have respectively argued to you that some witnesses are mistaken in their testimony, others are wilfully falsifying. The question of the veracity or truthfulness of the respective wit-

nesses is a question to be determined by you. If there is con-
flicting testimony you will endeavor to reconcile the same
without imputing perjury to any one. If such conflict can be
reconciled, then it is your particular province to determine
whom you will believe, and, in such determination, you will
conscientiously endeavor to pay due regard to the matter testi-
fied to by the witness, the manner of the witness when testify-
ing, the liability to be mistaken and the motive, if any, to falsify.

[In relation to the testimony of detectives, I cannot agree with
the assertion made by the senior counsel for the defense in his
argument, that it is a rule of law that the testimony of police-
men and detectives is the most unsatisfactory and unreliable
proof. I know of no such rule of law; certainly I never heard
of any such rule laid down by either of the two learned judges
who were my immediate predecessors on this bench; and such
rule will not be laid down by this court, as the law, until some
higher authoritative court compels its adoption. Detectives,
from the nature of their employment and associations, may nat-
urally be predisposed to suspect guilt and to put a guilty con-
struction upon actions. Juries should keep this in mind in
considering their testimony; but apart from this consideration
their testimony should be viewed in the same light, weighed in
the same scales, and measured by the same rules as the testi-
mony of other witnesses. If the detective is disreputable or
dishonest, or his testimony bears the earmarks of untruth, it
should be disbelieved. True, the employment of competent
detectives is expensive, but all the machinery for the detection
and punishment of crime is necessarily expensive; but I do not
think any citizen of Blair county would begrudge such ex-
pense, and, in this same connection, it might be proper for me
to say, so as to disabuse your minds of any idea that what has
just been said on the subject of detectives was in the least in-
tended to prejudice your minds against the defendant or weigh
against him, that I do not think any citizen of Blair county
begrudges the expense incident to giving defendants, charged
with high crimes, a fair and impartial trial, so that only those
who are proved to be guilty shall be convicted.] [18]

Verdict of guilty of murder of the first degree, on which
verdict sentence was passed.

*Errors assigned* among others were (2, 3, 4, 5, 13) rulings on evidence; (15, 18) above instructions, quoting them.

*R. A. Henderson*, for appellant.—Poet was not an expert: State v. Phair, 48 Vt. 366; Nelson v. Sun Mut. Ins. Co., 71 N. Y. 453.

A defendant cannot be convicted of one crime by proving that he committed another one: Ronsall v. State, 35 Ind. 460; People v. Barnes, 48 Cal. 551; People v. Sharp, 107 N. Y. 427.

The court should have permitted the attorney for defendant to ask Daniel McSweeny, on cross-examination, what compensation the detective agency was receiving from Blair county for its services in this case, and also as to the compensation of its operators who did the work on the case, for the purpose of showing their extreme interest and bias in the case, and to impeach their testimony: Shepard v. Parker, 36 N. Y. 517; Reg. v. Overton, 2 Moody C. C. 263; Com. v. Bonner, 97 Mass. 587.

*William S. Hammond*, for appellee.—Michael Poet was called by the commonwealth and examined touching the question of the length of time Bonnecke had been dead when his body was found. Poet was not called as an expert witness, nor did he testify as such. He did testify that he had experience with dead bodies; that he had been in the undertaking business for a number of years, and that when he was in the army he had charge of assorting the dead from the general hospital, at Hilton Head, South Carolina. When Bonnecke was found murdered on April 7, 1895, Poet was the coroner of Blair county, and, as was his duty, he examined the body, found it warm, limp and no presence of rigor mortis. He found a pool of fresh blood at the side of the head, and the wounds upon the head were still bleeding. These facts enabled him, with his experience, to approximate the time when Bonnecke died.

There was no error in permitting Peddicord to testify to the attack made upon Bonnecke by the witness and the defendant, February 21, 1895, after he testified to their planning and plottings to rob Bonnecke during the previous summer in the woods back of Altoona: Com. v. Ferrigan, 44 Pa. 388; Kramer v. Com., 87 Pa. 299; Kerr on Homicide, sec. 426; Wharton on Criminal Evidence (8th ed.), sec. 756.

Threats made by the accused, prior to the commission of the alleged offenses, are competent proof: 1 Bishop's Criminal Procedure, sec. 1110; Com. v. Crossmire, 156 Pa. 310; Com. v. Salyards, 158 Pa. 502.

OPINION BY MR. JUSTICE WILLIAMS, October 17, 1898:

The indictment in this case charges three persons with the crime of murder in the first degree, in the killing one Henry Bonnecke. They are the defendant, Frank Wilson and William Doran. Wilson and the defendant were separately tried and Doran has so far escaped arrest. The trial of Wilson resulted in a conviction. A new trial was refused and the case came into this Court by appeal. At the March term, 1896, Farrell, the defendant, was tried and convicted. His application for a new trial was refused and he also appealed. The two appeals were heard in this Court at the same time, and the proceedings upon Wilson's Appeal, with the opinion of this Court, will be found reported in 186 Pa. 1. For a full statement of the circumstances surrounding the murder, of the preparation of the case of the commonwealth by detectives, and the general questions affecting their credibility, reference is made to the case of Commonwealth v. Wilson, above cited. This appeal involves several questions not raised in that case which we will briefly consider in what seems to us their natural order: The first of these is raised by the second, third and fifth assignments of error, and relates to the admission of expert witnesses. Two things must concur to justify the admission of an expert witness. First, the subject under examination must be one that requires that the court and jury have the aid of knowledge or experience such as men not specially skilled do not have, and such therefore as cannot be obtained from ordinary witnesses. Second, the witness called as an expert must possess the knowledge, skill or experience needed to inform and guide the court and jury in the particular case. Upon such a question such a witness may be called and may testify, not merely to facts, but to his conclusions from the facts, because the court and jury are without the knowledge necessary to enable them to draw the conclusions for themselves without aid. In this case an old pocketbook which had been torn, and mended with thread in a coarse and clumsy manner, had been

put in evidence. Another pocketbook, said to have belonged to Bonnecke, which had been repaired by what seemed to be the same sort of thread, was put in evidence for the purpose of proving that the first pocketbook belonged to and had been repaired by Bonnecke. There was nothing peculiar about the first pocketbook, or the thread with which it had been mended, or the stitches taken upon it. We can see no question of art or skill raised here upon which special knowledge was needed, nor did the witness show himself possessed of expert knowledge if it had been necessary. The witness was competent, as any other witness would have been, to testify to any peculiar characteristics of the pocketbook or the thread or the stitches, and the jury could have compared them at their leisure and determined the value of the evidence ; but to dignify the testimony by treating it as that of an expert, was to invite the jury to treat it as entitled to some superior consideration, such as the testimony of ordinary witnesses was not entitled to.

The question about the length of time after death when rigor mortis may be expected to set in was a question for expert medical testimony. Long experience and observation might stand in lieu of the study of books and qualify one to speak as an expert upon this subject, but the witness called as an expert upon this question had no medical knowledge, had read nothing on the subject, and had no experience except as an undertaker's assistant in preparing dead bodies for burial. His attention as an undertaker does not seem to have been specially directed to this question, and he frankly stated that he was not an expert upon the particular subject.

The sixteenth assignment of error raises another question of the admissibility of evidence.

The commonwealth made a written offer to prove by one Joseph Peddicord " that in 1894 the defendant, with Frank Wilson, William Doran and the witness, had entered into a combination to rob Bonnecke ; that in February, 1895, the defendant and the witness assaulted Bonnecke in his own house and attempted to rob him, and that the same evening the defendant proposed to witness to renew the attack upon Bonnecke and effect the robbery; that the witness declined, and thereupon the defendant swore that he would get Bonnecke's money if he had to kill the old man to do so." This offer was limited

to no particular purpose, but was made with the idea that it was evidence for the purpose of establishing the guilt of the defendant. It was objected to, and both its competency and the admissibility of the witness were denied. It must be remembered that Bonnecke was killed between the night of the 4th of April, 1895, and the morning of Sunday, the 7th. The defendant could not have reached Altoona earlier than about 9 o'clock on Saturday evening, the 6th of April. It cannot be said to be clear that he was there at all on that night. Our question therefore is, do the facts embodied in this offer tend to show that the defendant did participate on the night of the 6th of April in the robbery and murder of Bonnecke. A threat to rob would have been admissible to show knowledge or motive on the part of the defendant, but there is no legal presumption that such a threat will be executed, such as relieves the commonwealth from the duty to prove the fact it alleges, viz : the participation of the defendant in the robbery and killing alleged. The court however, not only admitted the offer as tending to prove the actual presence at the murder of the defendant, but drew the attention of the jury to it as evidence bearing upon this subject. The learned judge said in his charge: "The commonwealth offered evidence which it is alleged points to the guilt of James Farrell, the defendant, and proves that he is the murderer or one of the murderers of Henry Bonnecke. Threats made by Farrell after his unsuccessful attempt to rob Bonnecke on February 21, 1895, as testified to by Joseph Peddicord, are relied on by the commonwealth as part of such proof. In this connection however I would caution you not to attach undue importance to the fact that Farrell did attack Bonnecke on February 21, 1895. Such fact was properly admissible as part of the res gestæ or surrounding circumstances of Peddicord's testimony, and as a circumstance which might point to the probability of Farrell's renewing the attempt, but you must not allow it to unduly prejudice you against the defendant." This was an instruction to the jury that the evidence of the attempted robbery and the threat to renew it had been properly received, and was to be considered as bearing upon the "probability of Farrell's renewing the attempt," or in other words, of his guilt of murder as charged in the indictment. The caution not to give

"undue importance" to the facts set out in the offer without some distinct statement of what this "undue importance" was, was of no value.

We come now to the question raised by the seventeenth assignment. The defendant was arrested at Allequippa, Beaver county, Pa., in November, 1895, some six months after the murder of Bonnecke. He was taken to Altoona, and two or three days later one of the detectives procured a search warrant, returned to Allequippa, and with the aid of a local constable made search in the room and bed which had been occupied by Farrell while at Allequippa. The constable found an old worthless pocketbook in the bed. This it was alleged, had belonged to Bonnecke, had been taken from him at the time of the murder, and kept concealed by Farrell for more than six months. This pocketbook had been torn, and rudely mended with thread of usual size and character. It was sought to connect this worthless pocketbook with Bonnecke by showing that he had a smaller pocketbook that had been mended in a similar manner. For this purpose a witness was put upon the stand as an expert to prove that the repairs upon each pocketbook had been made by the same person with the same thread. The witness declined to say that the repairs on both were made by the same person. The thread used had been the same in number on both, as he thought, but it was a common number and was not a certain basis for an opinion that the work had been done by the same person. This evidence was submitted to the jury in these words: "If the pocketbook in question, to wit: the pocketbook found in the bed at Allequippa, was the pocketbook of Henry Bonnecke, and was stolen at the time of his death in 1895, and was taken to Allequippa by Farrell, and was concealed in his bed, then there would be a strong presumption arising from the possession of stolen property, that Farrell was the robber or one of the robbers who stole said pocketbook, and unfortunately it would strongly tend to show that he is guilty of being concerned in the death of Henry Bonnecke." The other side of this subject was presented thus: " On the contrary if you have a reasonable doubt whether this pocketbook ever belonged to Henry Bonnecke, you should dismiss the circumstance of the mending of the pocketbook from the case and allow it to have no weight against the defendant." The only

consideration brought distinctly to the notice of the jury is the identity of the pocketbook brought from Allequippa as one of those which the murdered man owned and had in his possession at the time of his death. But suppose this be conceded, it by no means follows that the defendant either took it from the murdered man or placed it where it was found. What motive had the defendant if he had been one of the murderers of Bonnecke to keep this pocketbook? It was neither useful nor ornamental. Its possession could only be a source of constant danger. But if he really did desire to keep it, why put it in his bed, where it would naturally be discovered every morning when his bed was made up for the day? It might have been put there in his absence. It might have been put there even after the search began. Which seems most probable, that Farrell had kept this pocketbook for six months in his bed, or that it had found its way into the bed after his arrest? The credibility of this story was plainly for the jury, and they should first have determined its value.

In this connection the tenth assignment may be conveniently considered. The murder of Bonnecke occurred at a time when the attention of none of the surrounding citizens was attracted to it. The night when it was done was as wholly unknown as the persons by whom it was done. A detective agency was employed to investigate the case and to try and bring the guilty ones to trial and conviction. This agency spent much time on the case, and it was by them that the arrest of the defendant was procured. The detectives hunted up the evidence against him, or furnished it as the result of their interviews with him, or their investigations into his habits and surroundings. As tending to show their interest in the case, and to some extent affecting their credibility, they were asked upon cross-examination to state the general character of the contract with the county and how their pay was to be adjusted. This was objected to and excluded by the court. But why was it not competent? Whatever tends to show the interest or feeling of a witness in a cause is competent by way of cross-examination. If the witness had stated that his pay was conditional upon, or was to be affected by, the result of the trial in any manner, it cannot be doubted that such a bargain would have shown just what his interest in the conviction of the defendant was, and been entirely proper

for the jury to consider in determining his credibility. So, also, if he or his superiors had received a large sum from the county for services, and if they were really conducting the prosecution for the county, that fact could be shown upon cross-examination. It might not have been a very important fact, but it was a competent one upon cross-examination. There are other questions raised by the assignments of error that invite discussion, but their importance in this case is not such as to require it. Those we have considered are conclusive of this appeal and require us to reverse the judgment appealed from and award a new venire.

Let an order be entered accordingly.