## McElroy v. State.

### Opinion delivered October 9, 1911.

1. Homicide—threats as evidence of killing.—While threats are admissible as tending to show that the person making them was the person who did the killing, where that fact is in issue, mere threats to take the life of another are not sufficient to warrant a conviction in the absence of other evidence connecting the accused with the perpetration of the crime. (Page 355.)

2. Same—contradictory statement of witness.—Where, on the trial of a murder case, the testimony of a certain witness did not tend to incriminate the defendant, the fact that his testimony before the grand jury did tend to incriminate the defendant was competent to impeach the witness, but for no other purpose. (Page 355.)

Appeal from Grant Circuit Court; *W. H. Evans,* Judge; reversed.

#### STATEMENT BY THE COURT.

Fred McElroy was convicted of murder in the second degree in the Grant Circuit Court, upon an indictment charging him with killing Henry Spears, and sentenced to a term of twenty-one years in the penitentiary. His motion for a new trial was overruled, and he appealed. No exceptions were saved to the action of the trial court in its admission of testimony, or in the giving or the refusing of instructions, and only the question of the sufficiency of the evidence to support the verdict is presented to this court.

It appears that Henry Spears kept a store at Fenter, Arkansas, and, after he and his wife had retired on the night

of January 28, some one knocked on his front door, and, being asked what he wanted, replied: "A piece of tobacco out of the store." His wife was apprehensive that the voice was disguised, and cautioned her husband about going out, and had him make the party speak again before doing so. He took a lantern and opened the front door, and when he reached the porch two or three steps were heard on the porch, and a gun fired, and Henry Spears fell mortally wounded and died without speaking. He was shot with a shotgun at close range and a number twelve shotgun wad was found lying on the floor. The killing occurred about 9:30.

Mrs. Spears testified: "Just about the time he opened the door, I heard some one make two or three steps on the porch. When he reached the porch, I heard a gun shoot, and went out there, and found my husband had been shot, and he died without ever speaking a word. My husband was running a store. I recognized the voice that I heard call for the tobacco, as being the voice of a negro, and I thought it was Joe McElroy's voice. My husband told me, the day that he was killed, that he heard that Fred McElroy had made threats against him. My husband and Fred McElroy were to have a foreclosure suit on Monday. Fred McElroy had traded with my husband. They never had had any trouble before. Joe McElroy had also made threats against my husband, and they had also had a fight, and Joe was indicted by my husband for assault and battery, and the trial set for the February term of court. My husband owed Cunningham on a land note, and said that he would have to collect the $22 that Fred McElroy was owing him in order to meet his own obligations. The $22 that Fred was owing him was the Mat Henson debt that my husband had paid off for him."

M. W. Harris, foreman of the Rock Island fencing crew, was at his boarding cars, near the Spears home at the time of the killing, and heard the shot that killed Spears, and went immediately to the scene. He found him lying on the porch dead, and that deceased had been shot with a gun at close range, and found a number twelve shotgun wad lying on the floor. This was about 9:30 when the killing occurred.

J. W. Nichols testified that he lived about one mile north of Fenter, and was down at Fred McElroy's about a month

before the killing to collect a small debt, and found Fred and another party having a dispute about a pig. He asked Fred for the money he owed him, and was told by Fred that he didn't have it, but that he would pay it as soon as he could; that he was owing Henry Spears a little, and that Henry had been to see him two or three times about it, and if he messed with him he would leave his God-durn guts on the ground. That this was the only threat he ever heard Fred make toward the deceased, and that he seemed very angry toward Spears at the time, but that he had heard Joe McElroy make several threats toward Henry Spears, and that Spears and Joe McElroy had a fight about a year ago, and that Joe was indicted by the grand jury for assault and battery. Spears was to have been a witness against him in February about a month after he was killed. That he examined Tom McElroy's gun after the shooting, and that one barrel of it had been shot recently. That he also examined Joe McElroy's gun, and it had been fired recently. That Fred McElroy and Spears were to have a foreclosure suit on Monday following the killing. Fred owed Spears about $22.60, and Spears had a mortgage on a cow.

John Fenter stated: "I saw Fred McElroy on Friday before the killing on Saturday night. He said he had paid off the mortgage of Henry Spears by delivering him his cotton and allowing him to sell it, but that Spears took a part of the money he received for the cotton and paid off a debt that Fred owed Mat Henson of about $22. Fred said Spears ought to have kept the money he got for the cotton, and that he could not now get his cow. Tom McElroy, father of Fred, had two small mares. Fred and his father live about one hundred yards apart, and about a quarter of a mile from Joe McElroy's. Fred appeared to be angry at Spears when talking to me."

Hensley Crossland testified: That he was working for Tom McElroy, father of Fred McElroy, and "on the day of the killing Fred went to Malvern, and got back home about an hour after dark. He had swapped horses that day, and got a small mare, and came down to his father's. We all went out and looked at his new horse. Afterward Fred went on home. In about an hour or so, I went on down to Fred's house to pick guitar a while. I frequently went down there after supper. Fred lives in about one hundred yards of Tom McElroy's,

his father's, and Alice Tweed lives just across the street from
Fred.  Joe McElroy lives about three hundred yards on
further across the railroad.  Fred was at home when I got
there, and stayed there all the time I did.  I stayed about an
hour or an hour and a half, and then went back to Tom· McEl-
roy's.  When I went in, I had to pass the bed where Tom
McElroy and his wife slept.  There was not but one person in
the bed, and I thought it was his wife, as the person that was
in the bed was on the side that his wife slept on.  I did not
notice particular who it was, but thought it was Tom's wife.
It was nine o'clock or later.  I don't know exactly because I
had no timepiece.  I testified before the coroner's jury to
these same statements, and I also testified before the grand
jury to the same thing.  I owed Fred two dollars, and went
down to Spears's to get my check cashed, and Fred went as
far as Fenter station with me.  Spears cashed it, and held out
the two dollars I owed Fred.  This made Fred mad, and he
said that Spears was getting too smart here lately, and wanted
me to go back and get the two dollars, and said that Spears
was making himself busy about a woman he accused the de-
fendant of keeping down at the boarding cars; also if Henry
got his cow he would get her at the end of the law.  He said
several parties had talked to him about the time of the killing,
and was asked to name them.  He said Fred's father and mother
and W. H. McElroy, Vernon McElroy, Fred's wife, and a white
man by the name of Billy McElroy had told him to say it
was 9:25 when he left Fred's.  He also stated that the defend-
ant's attorneys had told him to swear the same, but on cross
examination witness admitted that defendant's attorneys
told him to swear nothing but the truth, and that if it was
9:25 to swear that it was.  They all said that if I swore it
was 9:25 it would clear Fred.  That defendant's mother and
aunt, Alice Tweed, talked to him the next night after the killing
about this at the home of the defendant's father.  That he
"was called before the coroner's jury twice, and the first time
he did not tell anything because he was away from home,
and had no place to stay except at defendant's father's.  He was
afraid to talk because there were several white men there,
and when recalled before the jury he asked that the doors be
closed while he was testifying, because he was afraid for those

on the outside to hear what he had to say. After Fred was turned out of jail and they put Joe McElroy in jail, and also took me and put me with him, that night Joe says: "Hensley, we are in trouble, and Fred has gone before the grand jury, and tried to get us into this. Now, then, you go back before the grand jury in the morning, and tell them that all you have told is false, and that you want to tell the truth, and that if it is not the truth that you hope God will strike you down this minute. You tell them that Fred wanted you to go with him to the boarding cars that night—the boarding car being near Spears's—to see a woman, and that, after you got started down the road, you discovered that Fred had a shotgun barrel sticking down by the side of his leg, and that you went down near Spears's, and that Fred told you to stop, that he would go down and scare Spears, that shortly after he left you on the railroad where you sat down to tie your shoe, you heard a gunshot, and in about five minutes Fred came running back, saying, "Trouble, trouble!" and ran up the railroad; that you ran on behind him, and when you caught up with him Fred said: "Hensley, if you ever tell this, I will blow your head off." Joe said he would get Mr. Jean, the sheriff, to take me before the grand jury the next morning, and the next morning when Mr. Jean came to the jail, Joe told the sheriff that I wanted to go back before the grand jury, and tell the truth about the matter, and asked Mr. Jean to see that I was carried back before them. A little later I was carried back before the grand jury, and told them what Joe had told me to tell them, and that Joe offered me five dollars if I would tell this story, and say that it was the truth. I told them this was what Joe wanted me to tell, but that this was not the truth. "I was at Fred's that night, as testified to before the coroner's jury, before the grand jury the first time and as testified to here, and Fred was at home, and if the grand jury understood my testimony the second time I went before them to be the truth they misunderstood me, as it was what Joe wanted me to tell them, and I was just telling them what Joe said to tell, and that it was not the truth, because I was at Fred's that night, and Fred did not leave home while I was there, and I did not go down to the railroad with him, as Joe wanted me to testify, but that part of my evidence is Joe's tale to get out of this. Joe also told

me that if I would tell this tale about Fred and I going down the railroad it would clear him. I am 16 years old. I don't know who killed Henry Spears or anything about it. Fred's lawyers told me to swear the truth, and that if it was 9:25 to swear that it was, and I have told the truth, and all I know about the matter."

A. V. Hope, who was a member of the grand jury that indicted the defendant, testified: "The first time that Crossland came before the grand jury, he told that he was at Fred's house on the night of the killing, and that Fred McElroy was at home, and that he went down there to hear Fred pick the guitar, and that he stayed there quite a while in the night, and then went back to Tom McElroy's, where he stayed all night. This was the first week of court. The week next after Joe McElroy was carried away he was brought back before the grand jury and testified that he and Fred on the night of the killing had gone down to the boarding car to see a woman, "and on the way I noticed that Fred had a gun sticking down by his leg, and when he got near Henry Spears's Fred told me to stop, and that he would go down and scare Henry Spears. I sat down on the railroad, and was tying my shoe, when I heard a gun shoot down about Spears's house, and in a few minutes Fred came running back, saying, 'Trouble, trouble down there!' and ran on up the railroad. I ran on, and caught up with him, and when I did Fred said, 'Hensley, if you ever tell this, I will blow your head off.' On this statement we indicted the defendant. He did not say that this was a story that Joe or some one else had fixed up for him to tell, and said that if it was not the truth he hoped God would strike him down that minute. We thought this last statement was true, and I know I did not misunderstand him. I asked him if this was a tale some one had fixed up for him, and he said that it was not."

Two other members of the grand jury testified to substantially the same statement.

Son Hankins, witness for the defendant, testified: That he lived near Fenter when the killing occurred. That defendant and the deceased had had business dealings with each other for quite a while. That he knew both of them intimately, and that he had never heard of any trouble between them be-

fore.  That Joe McElroy and the defendant did not get along
well together; and had no dealings with each other, neither did
they visit each other.  * * *  That they had some trouble
about a horse some time last year.  That Joe McElroy and
Henry Spears had considerable trouble, and at one time had
a fight.  That Joe was indicted, and that the trial was to have
come up in February after the killing in January, and that
Henry was the prosecuting witness against him.

Oscar Poe stated that he was present at Fred McElroy's
about a month before the killing, when J. W. Nicholls was
there to see Fred about collecting some money, and that Fred
didn't tell Nicholls that he would cut  Henry's guts out if he
messed with him, or make any  other  threats  towards the de-
ceased.  That Joe McElroy and Spears had trouble, and that
it was in the courts.  That Fred and Joe McElroy also had
trouble several times, and that they did not get along well
together.  Also had some hard feelings about some lumber
and cotton picking at another time.

William Smith testified that he lived near Fenter, and saw
the defendant about one hour after dark at his father's.  He
had been to Malvern that day, and swapped horses, and when
he came back home we all went out to see his new horse, and
after they looked at the horse he went home about one hundred
yards from his father's.  That the next morning he went up
to Fred's house, and told him that Henry Spears had been killed
the night before, and Fred said, "Oh, it is too bad."  "We
talked about the matter for a few minutes, and I went on home."
And that Alice Tweed and some others came up during the
time.

Woodward McBride testified that he was working  for
Spears at the time of the killing.  That Henry Spears and the
defendant were on good  terms, as far  as  he  knew, and  he
knew that Henry Spears traded with the defendant, and that
he never heard a cross word between them.  Fred and the de-
ceased were to have a foreclosure suit about a mortgage on
a cow on Monday following the killing.  That Spears did not
want to take the cow for the debt, but he wanted to put her
up and sell her in order to raise some money to meet a land
note, and if the cow did not bring enough money to pay the
$22 that Fred was owing him, he would still have judgment

for the balance. There was no misunderstanding between the deceased and the defendant on this arrangement, so far as I know or ever heard, and it was mutually satisfactory to both parties to sell the cow in this way.

Tom McElroy, father of Fred, stated that, after Fred returned from Malvern on the evening of the killing and showed him and the others a horse he had swapped for, he went on home about a hundred yards distant. That he saw him and his wife out at the barn later, feeding the horses. That he and his wife and Parlee McElroy and Will McElroy went down to Alice Tweed's that night, who was sick, and that Fred had brought her some medicine that night from Malvern, but before they left Hensley Crossland left. But that he didn't know where Hensley Crossland went, but he left about half an hour after Fred left, and a little later his wife and Will McElroy went to Alice Tweed's, who lives just across the street from the defendant. After stating the matter of the Mat Henson claim of Spears against Fred McElroy, and how it originated, and the arrangements made for its payment, he concluded: "There was no ill feeling between Fred and the deceased. Joe McElroy had trouble with the deceased, but Fred never did. They always got along well. Joe McElroy and the defendant never did get along well together, and never had any dealings lately, neither did they visit each other. Joe McElroy married my daughter, but otherwise we are no kin. Hensley Crossland came home that night, I think, between 9 and 10 o'clock, I had been asleep, and could not tell exactly. My wife and Will McElroy came home about 20 minutes later than Crossland. I heard of the killing about 8 o'clock the next morning."

E. M. Burrow testified: That he had heard the testimony of T. J. McElroy in regard to the Henson matter and the $22 that he owed Spears, which had been paid him by Fred McElroy. That he was at the trial in the justice's court between the defendant and Mat Henson over this $22, but that it was dismissed on account of some irregularity. That he and T. J. McElroy had talked about the matter, and told the defendant to give Henry Spears the cow and settle the matter up, and he talked on some time, and said something about going to Malvern to get a lawyer to fix the papers up and make Henson refund

the money. "The deceased and the defendant were on the best of terms, so far as I know. I know there was good feeling between them at the time we were all talking about this matter, and I have never heard of any trouble between the deceased and the defendant, and they agreed to work together in making Henson pay this money to the defendant. Joe McElroy and the deceased had had some trouble prior to the killing. My understanding about this foreclosure suit between the defendant and the deceased was that the deceased wanted to sell the cow at judicial sale, and that if she did not bring enough to satisfy his debt of $22 he would have judgment for the balance."

Parlee McElroy, the defendant's mother, testified: That after Fred returned from Malvern he went home and about an hour later, 8 or 8:30, she and Will McElroy, Hensley Crossland, Will Smith and her husband went to Alice Tweed's. That Will went to Joe McElroy's to get some coal oil to put in the lamp, and came back about 9:25, and we went home about 9:45. "I do not know who it was that looked at the clock when Will came in and said that it was 9:25, whether it was Will or Alice, I could not tell. When we went home, I saw Fred, the defendant, through his window, just across the street from Alice Tweed's. I also saw Fred and Hensley Crossland through the window when I went down there between 8 and 8:30. I told Crossland to swear that it was 9:25 when we left Fred's that night, because he said it was that time by Fred's watch, and I told him to swear the truth, and Fred would be turned loose."

Alice Tweed testified that she lived about one hundred yards, and that these parties came to her house at about 8:30 on the night of the killing to bring her some medicine which Fred had brought her from Malvern. That she sent Will McElroy to Joe McElroy's after some coal oil, and that he came back about 9:25; that he looked at the clock, and said it was 9:25, and he and his mother left the house at about 9:45; that she looked at the clock to see what time it was. It was 9:45 when the killing occurred, I heard. I am aunt of the defendant.

Will McElroy testified to the same statement of facts.

Fred McElroy, the defendant, stated that he lived about one hundred yards from his father. He detailed the trans-

action of the $22 he owed Spears on account of the Mat
Henson matter.  He stated that he had started to make a
crop that year, and that Mat Henson was to furnish him.
That Henson refused to furnish him, and that he gave Spears a
mortgage on his crop and his cow to furnish him supplies,
and Spears also advanced him money to have his cotton picked;
that he turned all the cotton over to Mr. Spears to sell to pay
off the mortgage.  He carried it to market, and old man Henson
was there, and demanded that Spears pay him $22 for me or
he would attach the cotton, and Mr. Spears finally paid him
the $22 and took his receipt for it.  When Mr. Spears came
home, he told me that the cotton paid off the mortgage except
forty cents, and he would give me that, but that he had to
pay Henson $22, but that he would help me collect it back
from Henson, and then I could give it to him.  He told me that
Henson would not let him sell the cotton until this $22 was paid,
and I told him that Henson was owing me, instead of me owing
Henson, and he said he would just bring suit and collect it back
from Henson.  Suit was brought, but the lawyer that repre-
sented Henson claimed that the papers were wrong, and had it
thrown out.  We then, in the presence of my father and Mr.
Burrow, a part of the time, talked over the matter, and I offered
him the cow for the debt, and said I would collect it back from
Henson myself.  He said he did not want to take my cow,
and would go with me to Malvern to consult a lawyer, and we
would get the papers right up and make him pay it back.  We
set a day to go to Malvern, but it rained, and then I went to
Malvern on the day of the killing.  I got to Malvern about
9:30 in the morning, and left Malvern about 4:30 in the after-
noon, after swapping horses.  It was after dark when I got
to my father's, and I called them out to look at my new horse.
A little later on I went home and after supper my wife and I
went to the barn to feed the horse.  When we went back to
the house, Hensley Crossland was there, and I picked the guitar
while he danced.  Crossland stayed at my house until about
9:25 by my watch, then he went home to my father's.  I went
to bed a little later, and the next morning about 9 o'clock
Will Smith came to my house and told me about the killing.
I asked him several questions about it, and he said he did not
know who did the killing.  About 11 o'clock Henry Perkins

came to my house, and told me they had a warrant for me for the killing of Henry Spears. I told him I knew nothing about it, and why they were laying it on me. I did not try to get away, as I was not guilty. At 12 o'clock Mr. Church came and arrested me, and I told him I had been expecting this, as Henry Perkins told me they had a warrant for me. When Jack Nicholls swore he heard me say I would cut Henry Spears's guts out he swears positively false, and I can prove it." He denied keeping a woman at the boarding cars; denied seeing John Fenter on Friday before the killing; said Spears was always a friend to him, and continued so until the time of his death. "I never had any ill feeling toward Mr. Spears, and I positively did not kill him. I am innocent of this crime. Joe McElroy and I are not friends. We have not got along together for several years. I have not got any gun, and carried my father's gun to the bottoms to look after some stock on Tuesday before the killing and shot it only one time that day. I did not try to get away from the officers when they arrested me in Hot Springs, but came out and met them, and gave myself up, for I knew I was innocent."

Appellant *pro se.*

The evidence is wholly insufficient to connect appellant with the commission of this crime, but the verdict, in the light of the testimony, appears to be the result of passion and prejudice. This court will reverse when the verdict is so clearly against the weight of the evidence as to shock the sense of justice. 3 Greenleaf on Ev. 30; 2 Ark. 360; 7 Ark. 462; 10 Ark. 492; 34 Ark. 632; 70 Ark. 365.

A fact is not proved where the evidence merely gives rise to conjecture or suspicion. 17 Cyc. 754; *Id.* 817.

*Hal L. Norwood,* Attorney General, and *William H. Rector,* Assistant, for appellee.

Kirby, J., (after stating the facts). The testimony is set out at some length, the sufficiency of the evidence being the question here, and shows that the murder of Henry Spears was a foul assassination. The evidence tending to connect the defendant with the crime was the threats testified to by Nicholls and Fenter to have been made by him shortly before the killing, and the statement made by witness Hensley Crossland

on his second appearance before the grand jury, as testified to by three members of the grand jury, contradicting his explanation and recital of it. The motive attempted to be shown for the killing was the prevention of the sale of a cow for a debt of $22 which defendant admitted owing to deceased, and which all the testimony showed he had voluntarily secured and agreed to pay.

"Threats are admissible as tending to show that the person making them was the person who did the killing, where that fact is in issue," as in this case. Wharton on Homicide, § 601; *State* v. *Davis*, 6 Idaho 159; *Nichols* v. *Commonwealth*, 11 Bush 578; *State* v. *Cummings*, 88 S. W. (Mo.) 706; *Baker* v. *State*, 45 Texas Crim. Rep. 392, 77 S. W. 618.

"But the prevailing rule seems to be that mere threats to take the life of another are not sufficient to warrant a conviction, in the absence of other evidence connecting the accused with the perpetration of the crime." *Barley* v. *State*, 104 Ga. 530, 30 S. E. 864; Wharton on Homicide, § 605; *Jones* v. *State*, 57 Miss. 684; *Com.* v. *Farrell*, 187 Pa. 408, 41 Atl. 382; *State* v. *Glahn*, 97 Mo. 679, 11 S. W. 260. The only testimony besides the threats tending to connect the defendant with the commission of the murder was the statement of Hensley Crossland to the grand jury upon his second appearance before that body, as testified to by the members of the grand jury, and this statement and their testimony was admissible only to contradict said witness and impeach him, and not entitled to consideration for any other purpose on the trial.

The testimony of the grand jurors of their belief of the truth of this statement was incompetent, and should not have been admitted, but there was no objection made nor exception saved on account of it. Notwithstanding this, only such testimony as was competent will be considered by this court in testing the question of the sufficiency of the evidence.

The jury not being entitled to consider said statement of the witness Crossland before the grand jury as disclosed by the testimony of the members thereof, contradicting his explanation and recital of it, as in any wise tending to show the guilt of the defendant, but only as affecting the credibility of the witness, nor the testimony of said grand jurors that they believed his statement as made to the grand jury and related

by them was true and on that account indicted defendant, leaves the verdict supported only by the evidence of the threats which, as already indicated, is not sufficient.

Upon the other hand, several witnesses testified to the whereabouts of the defendant on the day and the night of the killing, and their testimony tended strongly to prove an alibi, and, after a careful consideration of the whole case, we are of the opinion that the testimony is not sufficient to support the verdict, and the judgment is reversed, and the case is remanded for a new trial.