## Commonwealth of Pennsylvania *v.* Ernesto et al., Appellants.

*Criminal law—Involuntary manslaughter—Explosion of unlawful still—Fire—Loss of life—Demurrer—Evidence—Counts of indictment —Sentence on several counts.*

On the trial of an indictment for involuntary manslaughter there was evidence that defendants installed and operated in the cellar of a private house a plant for redistilling denatured alcohol for beverage purposes. During the operation of the still an explosion occurred which set fire to the building. Several persons were killed.

Such evidence is sufficient to support a conclusion that the illegal act of defendants was the cause of the loss of life and a conviction of involuntary manslaughter will be sustained.

Involuntary manslaughter consists in the killing of another without malice and unintentionally, or in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty.

In criminal cases a demurrer to the evidence of the Commonwealth admits all the facts which the evidence tends to prove and all inferences reasonably deducible therefrom.

Where each count of an indictment charged the killing of a different person by one and the same unlawful act, there is but one injury to the Commonwealth, and the court is without power to impose a sentence more severe than that provided for a single act of involuntary manslaughter.

Argued March 12, 1928. Appeals Nos. 379, 390 and 391, October T., 1927, and No. 18, October T., 1928, by defendant from judgment and sentence of Q. S., Berks County, September T., 1927, No. 164, in the case of the Commonwealth of Pennsylvania v. Nicholas Ernesto, Ben Myers, Thomas DeMaio and Angelo Consoli. Before HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ. Conviction affirmed. Sentences reversed.

**340**      COM. *v.* ERNESTO et al., Appellants.

Indictment for involuntary manslaughter. Before STEVENS, J.

The facts are stated in the opinion of the Superior Court.

Finding of guilty on demurrer to evidence. The court imposed sentence on each of seven counts of the indictment. Defendants appealed.

*Error assigned* was the judgment of the court.

*Wm. T. Connor,* and with him *John R. K. Scott,* for appellants.—The evidence was insufficient: Potter v. State, 162 Ind. 213; Commonwealth v. Byers, 45 Pa. Superior Ct. 38; Pauli v. Commonwealth, 89 Pa. 432; Commonwealth v. Bone, 64 Pa. Superior Ct. 44; State v. Morney, 196 Mo. 49.

*John W. Speicher,* Assistant District Attorney, and with him *Oliver M. Wolff,* District Attorney, for appellee.

OPINION BY CUNNINGHAM, J., April 18, 1928:

Shortly after midnight on July 8, 1927, the wife and six children of Marks R. Fair lost their lives in a fire which destroyed their home, a frame dwelling-house located in a somewhat isolated valley near Bernville, Berks County. The Commonwealth contends that the fire was caused by the explosion of a still in the basement of the house, with which Nicholas Ernesto, Ben Myers, Thomas DeMaio, Angelo Consoli and the said Marks R. Fair, acting together and pursuant to a conspiracy to violate the liquor laws, were redistilling a denatured alcoholic product for the purpose of removing the denaturants, to the end that it might be sold for beverage purposes. Upon the theory that the deaths of these seven persons resulted from the doing of this unlawful act the five defendants above named were indicted for involuntary manslaughter under a

single indictment containing seven counts, the first of which was based upon the death of the wife, Kate M. Fair, and each of the remaining six on the death of a child. When the defendants were called for trial the husband, Marks R. Fair, entered a plea of nolo contendere and the jury was sworn to try the other four upon their pleas of the general issue. Marks R. Fair testified as a witness for the Commonwealth. At the conclusion of the Commonwealth's testimony each of the defendants demurred to the evidence. The Commonwealth joined issue on the demurrers and the learned trial judge, after discharging the jury (Com. v. Sonis and Sonis, 81 Pa. Superior Ct. 205) and after argument upon the demurrers entered a judgment finding each defendant guilty as indicted. Upon the refusal of a new trial the district attorney moved for a sentence upon each count in the indictment. Counsel for the defendants objected upon the ground that but one offense had been committed as all the deaths had resulted from one and the same act. The trial judge however sentenced each of the defendants "to a fine of fifty dollars to the Commonwealth for the use of the County of Berks, that they undergo an imprisonment in the Berks County prison for a period of two years on each of the first five counts to run cumulatively, and two years each on the last two counts to run concurrently, to be computed" etc. From the judgments thus pronounced the defendants have taken these separate appeals which will be disposed of in one opinion.

The assignments of error are identical in each appeal and raise two questions: (a) whether the evidence was sufficient to warrant the conviction of the respective defendants; and (b), if so, whether a sentence may legally be imposed under each count in the indictment. The effect of the demurrers was clearly stated by Judge HENDERSON in Com. v. Williams, 71 Pa. Superior Ct. 311: "In criminal cases [a] demur-

rer to the evidence of the Commonwealth admits all the facts which the evidence tends to prove, and all inferences reasonably deducible therefrom: Commonwealth v. Parr, 5 W. & S. 345; Golden v. Knowles, 120 Mass. 136; Wharton's Crim. Ev. Sec. 616; McKowen v. McDonald, 43 Pa. 441. The court in such case is not the trier of the facts. The admissions implied in the demurrer leave for consideration the single inquiry whether the evidence introduced presents such a state of facts, with the inferences fairly arising therefrom, as would support a verdict of guilty.''

There, as here, the trial judge found that there was competent testimony to warrant such a conclusion by the jury and it was held that the burden was therefore cast upon the appellant to show that in all the evidence there was not to be found support for the accusation contained in the indictment. A detailed recital of all the distressing circumstances surrounding this tragedy is unnecessary. The material facts shown by the evidence and the inferences reasonably and fairly deducible therefrom are these: Several months prior to the date of the fire Ernesto, Myers, DeMaio and Consoli, having engaged in a conspiracy to violate the Snyder Act of March 27, 1923, P. L. 34, by manufacturing and selling intoxicating liquor for beverage purposes, were desirous of securing a secluded place for the operation of a still, with which they proposed to redistill denatured alcohol (which had been released to certain manufacturers of barbers' supplies in Philadelphia) for the purpose of removing the denaturants to such an extent that the product resulting from the redistillation might be sold and used for beverage purposes. Having become acquainted with the location of Fair's home during the previous hunting season, they rented the basement of his house as a convenient place for their operations. Ernesto, Myers and Consoli made the arrangement with Fair for a rental of $50 per month and agreed to pay him $40 per week for driving

the truck used to bring the so-called "toilet water" from Philadelphia to his house. A boiler, fired with anthracite coal, and a still were installed in the cellar some five or six weeks before the fire. The denatured alcohol was purchased in Philadelphia and transported by truck in large steel drums. After redistillation in Fair's cellar it was placed in tin cans for sale. De-Maio at one time paid Fair $25 on account of his services in driving the truck; hauled coal for the boiler and sometimes drove the truck himself. Fair drove the truck to and from Philadelphia at least three times. On the first trip he brought back two barrels of denatured alcohol; on the second, one hundred and eighty-six five-gallon empty tin cans; and on his last trip, on the day of the fire, five drums of "hair tonic." About 9:30 o'clock on the evening of that day, Ernesto, Consoli and Fair were together at the Fair home. Ernesto tested the liquid which Fair had brought from Philadelphia and said he needed all that could be put through that night, twenty-five or thirty cans. Ernesto left the premises and Consoli remained in the basement.

When Fair's family retired to the second story about 10:30 he remained on the first floor and went to sleep on a lounge because he intended to go to Philadelphia early the next morning. Shortly after midnight an explosion occurred which knocked him off the lounge. The entire house was almost instantly aflame. Fair ran upstairs in a vain attempt to rescue his family and, as the floors fell in, jumped out of a window. The explosion was heavy enough to jar at least one house several squares distant and to rouse several neighbors who, upon their arrival, found "the whole house in flames, coming out the windows" and Fair wounded and burned, and Consoli severely burned. In the ruins were found the boiler intact; the still "knocked apart;" a pump; several fifty-gallon drums; a large number of empty cans; and one containing a

liquid from which a sample was taken for chemical analysis. The expert testimony showed that the sample was a redistilled product, containing slight traces of two denaturants; that it contained 24.21 per cent. of ethyl alcohol by volume; that it could have been distilled from toilet water; and that the process of distillation would remove denaturants if the liquid "were strictly held to the boiling point" during the process. There was evidence that the vapor produced in the distillation of alcohol is more highly inflammable than alcohol itself. Fair, at the trial, testified positively that there was no fire in any part of the house above the basement when the family retired, but admitted on cross examination that during the forenoon of the day following the fire and while in the hospital he made a contrary statement which he now says was untrue. This testimony reads: "Q. What did you say that time was the cause of the explosion? A. I was pretty bad and I said it was a stove, a coal-oil stove exploded. Q. At that time you thought you were going to die? A. Yes, sir, and it was pretty near. Q. And you said at that time it was a coal-oil stove that exploded? A. Yes, sir. Q. You didn't say anything about Consoli that time, did you? A. No, sir. Q. As a matter of fact you don't know what did explode, do you? A. No, sir. Q. And you don't know what caused the fire? A. Not while I was sleeping, no, sir." Upon this branch of the case the learned counsel for appellants concede in their printed brief that there was evidence that defendants rented the cellar for the purpose of setting up the still and operated it to redistill hair tonic, and that their object "was to sell the product for beverage purposes." Their principal contention, as stated in their brief, is: "There was nothing in the evidence which would warrant the statement that the still, while in operation, exploded; nor is there any warrant for the conclusion or finding that the fire was caused by the explosion of the still. The statement

[in the opinion refusing a new trial] that the still was damaged, as it would have been if it had exploded, is also without the support of any testimony produced at the trial." The county detective, producing the parts of the still found in the ruins, testified: "Q. What is the copper apparatus in the court room there? A. The back ones there are what you call a still..... Q. I suppose the front one you call a coil? A. A coil that was in the condenser, cooling tank. The cooling tank was all burned away, it was all battered up, and the coil was there just laying right in it ...... Q. You couldn't tell from the looks of the still when you saw it as to whether it had been in operation or not? A. No, sir." The trial judge had an opportunity to observe the condition of the still and doubtless his conclusion that it had been "damaged as it would have been if it had exploded" was based to some extent upon this inspection. From the established facts that within the three hours preceding the explosion Ernesto told Consoli that he "wanted all that he [Consoli] could put through till tomorrow morning. He needed it....... About twenty-five or thirty cans," that Consoli remained in the basement and Fair lay down on a couch in order to be ready to go to Philadelphia early the next morning, we think it is a reasonable inference that the still and boiler were in operation up to the time of the fire; and from the established facts that the vapor generated in the process was highly inflammable, that there was an explosion severe enough to throw Fair off the lounge and to jar and rattle the shutters of a neighboring house several squares away, that the explosion was followed so quickly by the fire, and that Consoli was severely burned, it seems to us that it is also a fair inference that the fire was caused by an explosion of the still. The facts and circumstances are not only all consistent with such inferences but also seem to be inconsistent with any hypothesis other than that the still exploded while being operated by Consoli

in obedience to Ernesto's urgent instructions. We adopt for the purposes of this case the definition of involuntary manslaughter, approved by our Supreme Court in the recent case of Com. v. Mayberry, 290 Pa. 195: "Involuntary manslaughter consists in 'the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty'; 29 Corpus Juris, page 1148; Wharton on Homicide (3d ed.) section 211; Com. v. Micuso, 273 Pa. 474; Com. v. Gable, 7 S. & R. 422; 13 R. C. L. page 784;" and see also Com. v. Ochs, 91 Pa. Superior Ct. 528. It is clear that the defendants were jointly engaged in doing an unlawful act, not amounting to a felony or naturally tending to cause death or great bodily harm, in the basement of the Fair home; it is equally clear that none of them had the slightest intention to cause the death of anyone, but, in our opinion, the proofs are sufficient in volume and quality to justify the conclusion that seven deaths, using the phraseology of our Penal Code, "happened in consequence of the unlawful act" in which the defendants were engaged. Our examination of the entire record convinces us that there is competent evidence which would have warranted a verdict of guilty if the case had been submitted to the jury and the trial judge was therefore justified in overruling the demurrers and adjudging each of the defendants on trial guilty of the charge contained in the indictment. The second assignment of error upon each appeal is accordingly dismissed.

On the other branch of the case, however, we are of opinion that, under the principles announced for this court by our late President Judge ORLADY in the case of Com. v. Veley, 63 Pa. Superior Ct. 489, the trial judge erred in sentencing the appellants upon more than one count in the indictment. As we understand

these sentences each appellant was sentenced to a fine
of $50 and imprisonment in the Berks County prison
for a period of two years on each of the seven counts,
the sentences on the last two counts to run concurrently
with those upon the first five counts, thereby making
the total term of imprisonment ten years.   Evidently
the sentences were pronounced upon the theory that be-
cause seven deaths occurred the appellants were guilty
of seven distinct and separate acts of involuntary man-
slaughter.   In the case cited the charge was likewise
involuntary manslaughter predicated upon the alleged
negligence of the defendants in the construction of
a dam, the breaking of which resulted in the deaths of
a number of persons, among them being the three
women referred to in the opinion.   The defendants in
that case were indicted and acquitted of the charge
of involuntary manslaughter in causing the deaths of
two of these women.   Subsequently they were charged
with involuntary manslaughter in causing the death of
the third, and it was held by this court that this second
prosecution was barred by the former acquittal.   The
only difference between that case and the present is
that the deaths there were alleged to have occurred
from the doing of a lawful act in a negligent manner
and in the case at bar from the doing of an unlawful
act.   In both cases the injury done the Commonwealth
forms the basis for the prosecution and not that done
to any individual.   In the Veley case Judge ORLADY
said:   "The record presents the case of several per-
sons losing their lives through the same disaster, viz:
the breaking of the dam of the Bayliss Pulp and Paper
Company, which in each of these prosecutions is al-
leged to have been caused by the negligence of the re-
lator [the president of the company] through defective
construction of the dam.   The negligent act, if any,
which caused the breaking of the dam, was the act
which caused the deaths of the three women named.
There was but one causal effect, though the result af-

fected many parties. . .. .... Where there is but one act of cause of injury, or death of a number of persons, there is but one injury to the Commonwealth, but where the acts or causes are separate, they are separate injuries to the peace and dignity of the Commonwealth." We think this reasoning is applicable to this record which presents the case of seven persons losing their lives through the same disaster. The same unlawful act which caused the death of any one of the persons mentioned in the indictment caused the deaths of the others. There was but one injury to the Commonwealth involved in this prosecution and that neither a malicious nor an intentional one in so far as its unfortunate results are concerned. We think the court below, under all the circumstances of this case, had no power to impose a penalty more severe than that authorized by law for a single act of involuntary manslaughter—a fine not exceeding $1,000 and imprisonment not exceeding two years. We accordingly sustain the first assignment of error in each appeal, but, as stated in Com. v. Camwell, 89 Pa. Superior Ct. 339, and the cases there cited, this conclusion does not require anything further than a reversal of the sentence without affecting in any way the conviction of the respective appellants.

The sentence of the Court of Quarter Sessions in each of the four above mentioned appeals is reversed and set aside and the respective records are remitted to the said court with direction to proceed to sentence the defendants anew in due form and according to law.