Com. of Pa. *v.* McTague and Tobin, Appellants.

Argued November 20, 1933.

Before KELLER, CUNNINGHAM, BALDRIGE, STADT-
FELD, PARKER and JAMES, JJ.

*Earl V. McLaughlin,* and with him *R. P. Campbell,* for appellants.

*Wallace G. Moser,* First Assistant District Attorney, and with him *John J. Owens,* District Attorney, for appellee.

OPINION BY JAMES, J., March 13, 1934:

Both defendants, who were guards or attendants at the Hillside Home, stand convicted on indictments charging involuntary manslaughter in causing the death of one Louis Goldberg, an inmate of said home, on October 6, 1932. The defendants were charged in separate indictments but were tried together. On these appeals by them it is urged in their behalf that their point requesting a verdict of not guilty should have been affirmed because the evidence is insufficient to support the verdict.

At four o'clock on the afternoon of October 5th, Louis Goldberg was committed to the Hillside Home, an official institution for indigent and insane persons of Lackawanna County, for the purpose of observation, and died in the same institution at about six o'clock on the afternoon of October 6th.

Upon his entrance to the hospital on October 5th he was turned over to attendant Arthur Barry who proceeded to take him to his ward. While on his way

upstairs, the patient attempted to escape and a struggle ensued in which the attendant was able to overcome him. The guard testified that during the struggle the deceased may have bumped himself, that he had held him by the arms and grabbed him around the stomach; that he was then taken and bathed and clothed by the attendant and placed in bed in Ward J, at which time he saw signs of injury on the patient's legs. The patient went to his supper at six o'clock and returned to his bed in the ward.

According to the testimony of Joseph Murphy, an alcoholic patient who had been confined to Ward J, about 2:30 A. M., when returning from the lavatory and passing Mr. Goldberg's bed, the deceased was sitting on his bed screaming and hollering something about electrocution; that he went over to the bed to pacify him and the deceased sprang at him like a tiger and that he acted like a mad man; that deceased grabbed hold of him and pulled him and that he slapped Goldberg twice on the face; that then a struggle ensued whereupon McTague, one of the defendants, came to his assistance and a further struggle ensued between Murphy and McTague with the deceased, during which they were pulling and pushing the deceased toward the ward door, in which struggle the deceased was upon the tile floor, between the beds and under the beds and that the struggle ensued for a matter of some ten or fifteen minutes during which time Tobin, the other defendant, observing the struggle, turned on the lights and came to the assistance of McTague and Murphy; that the guards were attempting to withdraw the patient from the ward to a seclusion room just a short distance from the ward for the purpose of placing a straight jacket upon him; that while in the seclusion room the patient was so violent that these three men were unable to restrain him and McTague went to obtain further assistance

from Joseph Shea, another patient of Ward J, and the struggle continued in the seclusion room for fifteen minutes in their efforts to place the straight jacket upon the deceased. In reply to the following question by the Commonwealth: "Q. Will you describe to us, Mr. Murphy, and do it as plainly as you can, just what was done in putting that straight jacket on him?" the witness answered, "A. Well, that is pretty hard. We had—we had an awful time getting it on him. That man was there punching with his fists, and kicking with his feet, and spitting, and biting, and it was no joke for us to be there with that jacket. He didn't hold his hands out that way (indicating) for us." Murphy also testified that during this struggle sometimes the deceased was down on the floor and sometimes he was up and the struggle continued for about fifteen minutes when he was finally placed in the straight jacket; that during this time none of the four men who were in the room struck him or kicked him or abused him in any manner or used any further force than was necessary to place the straight jacket upon him. This testimony was corroborated by Joseph Shea, the other patient, who confirmed the story of Murphy that the only man to strike the deceased was Murphy; that he, Shea, had grabbed the feet of the deceased during the struggle and Tobin, who had an artificial leg, was holding his knee against the patient's back. After the straight jacket was placed upon deceased, he was left on the floor but the guards and Murphy and Shea later returned to the room to tighten the straight jacket which had been loosened by further struggles while lying on the floor. The following morning the patient was placed in a bed in the ward. Immediately after the trouble, McTague and Tobin reported the trouble to the night supervisor and they made a written report which was found by the assistant superintendent, a physician, on his desk in the morning when he arrived at his office.

The assistant superintendent went to the bedside of the man in the morning and found him suffering from two bruised and swollen eyes and abrasions on his chest and face. He examined deceased again in the afternoon but did not think his condition serious as to dying or find anything to indicate internal injuries. Other medical testimony established as a result of an examination of the body and the post mortem examination, that the deceased had two badly swollen and discolored eyes, brush burns and abrasions over the greater part of his body, two broken ribs on the right side, one broken rib on the left side, and a ruptured kidney, and that he died as a result of the ruptured kidney. The testimony of the defendants substantially confirms the testimony of both Murphy and Shea.

Involuntary manslaughter consists in the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty: Com. v. Mayberry, 290 Pa. 195, 138 A. 686; Com. v. Micuso, 273 Pa. 474, 117 A. 211; Com. v. Ernesto et al., 93 Pa. Superior Ct. 339.

The governing question is whether or not the death of Goldberg was due to the negligence of the two defendants and whether that negligence was sufficiently gross as to have made the act unlawful, either in the manner in which they themselves maltreated the deceased, or whether the two men acting under their supervision and direction were, by the gross carelessness of the defendants, permitted to inflict the fatal injury. The precise question evidently has not been raised in our jurisdiction as we find no case which deals with the criminal negligence of a guard or attendant of a hospital or asylum. The general rule is as found in 21 Am. & Eng. Enc. of Law 198: ''It has been stated that one who has the custody and care of

a human being, helpless either from imprisonment, infancy, sickness, age, imbecility or other incapacity of mind or being, is bound to execute the charge with proper diligence and will be held for involuntary manslaughter if by culpable negligence he lets the helpless creature die." The Commonwealth's theory is not one of omission but that in the performance of their duty the defendant used more force than was reasonably necessary.

In the case of State v. Brown, 36 Atl. 458 (1896 Del.) at p. 465, the following excerpt from the charge states the responsibility and duty of attendants in a hospital or asylum and which we believe to be the correct rule: "In the management of such an asylum, so much force must be used in each particular case as may be necessary to enforce and maintain wholesome discipline and sanitary regulations. The law will not measure with extreme nicety or exact calculation just how much force the attendant may use, provided he acts reasonably, and without intentional cruelty or viciousness. If you were to bind the hands of the attendant by any such rule, his life might be in the unreasoning caprice of a violent maniac, and the insane would practically rule the institution. ...... It is our duty to protect these demented patients by the closest scrutiny, and to punish wilful or careless cruelty; but it is equally our duty to protect the attendants in the discharge of their duty, from officious interference and reflections and uphold them in the maintenance of reasonable rules ...... They had a right to use all such force as was reasonably necessary to effect that purpose (bathe him)."

An examination of the record discloses two types of proof, first, the condition of the deceased's body, and, second, the positive testimony of the two patients who participated in the alleged offense. The medical testimony, insofar as it connects defendants with the

injuries can be regarded as purely circumstantial, and would have been sufficient from which the jury could have inferred such carelessness on the part of the defendants as would have justified a conviction, but shall we wholly disregard the positive testimony of eye witnesses and participants?

In passing upon this record we must apply the rule as laid down in Com. v. Byers, 45 Pa. Superior Ct. 37, 38; Com. v. Bone, 64 Pa. Superior Ct. 44, 48: "When a crime charged is sought to be sustained wholly by circumstantial evidence, the hypothesis of guilt or delinquency should flow naturally from the facts and circumstances proved, and be consistent with them all. The evidence of facts and circumstances must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed, or in other words the facts and circumstances must not only all be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence."

At the conclusion of the Commonwealth's case the circumstantial evidence connecting the defendants with the injuries was sufficient from which the jury could have found the defendants guilty, while the direct testimony of the Commonwealth established that the defendants were not guilty and when the defendants' case was closed and the case was submitted to the jury, in order to find the defendants guilty the jury had to disbelieve both the eye witnesses for the Commonwealth and for the defense. Under such facts and circumstances shall we permit the jury to regard the circumstantial evidence of the Commonwealth of sufficient weight to overcome the positive and direct proof of the Commonwealth to the contrary? How can it be said that under the circumstantial evidence of the Commonwealth, which must be considered with the direct proof for the Commonwealth, the facts and circumstances are inconsistent with innocence?

The hypothesis of guilt which should flow naturally from all the facts and circumstances proved, and be consistent with them all, is overcome by the direct and positive testimony of the Commonwealth. We are convinced from an examination of the entire record that the proof has not been sufficient in volume or quality to overcome the presumption of innocence and where the proof fails to measure up to this standard there is nothing to support a conviction and the defendants are entitled to be discharged. We reach this conclusion only after an earnest and serious consideration of the entire record.

We find the following line of reasoning in the opinion of the court below: "In the ordinary course of events, it must be presumed that an insane patient need not be bruised to death to maintain wholesome discipline in an insane asylum. When an insane person comes to death by violence while under the care of another person, the circumstantial evidence is sufficient to infer the guilty negligence of the keeper. It should be the duty of the keeper to explain circumstances which would account for the death of the person in his charge. To hold that the Commonwealth must show the details of the acts which caused the death of a person under the charge of a keeper of the insane would place all of its evidence under the control of the accused and make impossible the conviction of the killer of the insane." With this language we are in accord but this is not a case solely of circumstantial evidence. The Commonwealth here attempts to establish the guilt of the defendants by circumstantial evidence while the direct and positive testimony of the Commonwealth establishes the defendants' innocence.

The assignment of error is sustained. The judgment is reversed and the defendants are discharged without day.