## Commonwealth v. Tunstall

*J. William Ditter, Jr.,* for Commonwealth.

*James R. Caiola,* for defendant.

FORREST, J., April 11, 1956.—The district attorney has filed so-called "Appeal" in the nature of exceptions to the action of the trial judge in sustaining defendant's demurrer to the Commonwealth's evidence on charges of "misprision of felony" and "accessory

after the fact to murder". The "murder" involved was committed by one John Schnur upon one Carl Schwarz to which he pleaded guilty generally before the court en banc. He was found guilty of murder in the first degree and sentenced to imprisonment for life. For the purpose of deciding upon the demurrer the facts which the Commonwealth's evidence tends to prove and the inferences reasonably deducible therefrom are deemed to be admitted: Act of June 5, 1937, P. L. 1703, sec. 1, 19 PS §481.

"The commonwealth may appeal . . . where the judge has sustained defendant's demurrer, which raised the pure legal question of the sufficiency of the proof to support the crime charged: (citing cases) . . . The proper test to apply to the validity of a demurrer is whether the 'evidence of record' (Commonwealth v. Ernesto, 93 Pa. Superior Ct. 339, 341, 342), the 'admitted state of facts' (Commonwealth v. Kerr, supra, p. 601), the 'evidence produced' (Commonwealth v. Williams, 71 Pa. Superior Ct. 311; Commonwealth v. Kolsky, supra, p. 599), and 'all the facts testified to and the inferences reasonably drawn therefrom' (Sadler, Criminal Procedure in Pennsylvania, Vol. II, §541, pp. 611, 612), would support a verdict of guilty": Commonwealth v. Frank, 159 Pa. Superior Ct. 271, 277, 278 (1946).

Considered in the light of the aforementioned rule, the evidence adduced by the Commonwealth at the trial showed that on August 17, 1955, the defendant, a 16-year-old girl, living with her parents in Philadelphia, had been a friend of John Schnur for nearly three years, that she had frequently gone out with him on "dates", that these "dates" had often been spent in company with Carl Schwarz and a girl friend of his, that defendant had visited in both John's home and Carl's home and had met Carl's parents, that Carl and

John were always good friends, that she had never observed them engage in fisticuffs or threaten one another with physical harm, that on August 17, 1955, at about 6:30 p.m., John had visited her home, that Carl had stopped there for him and that they drove off in Carl's truck, that John telephoned her on the same evening and pursuant thereto he returned to her home at about 9:30 p.m., that he told her, "I shot Carl and won't you come with me?" She declined and he said, "I was only kidding. I just wanted to see what you would say". He again suggested that she go with him for a ride, and she said, "All right, we'll go and get a custard".

Upon entering the truck she noticed Carl's feet and asked what was the matter with Carl. John replied: "He's drunk. He told me to drive around for a while until he sobered up", that she believed that Carl was drunk, that she had previously seen John in an intoxicated condition, that she had noticed a rifle in the truck and that she had previously seen it in John's cellar, that defendant noticed her parents coming down the street and told John so, that John said nothing, but seemed frightened, that he drove recklessly around curves, that she was frightened, that finally, in the vicinity of Upper Black Eddy, or Washington's Crossing, his truck skidded and crashed into a house, that he told defendant to get out of the truck and follow him, that they climbed up a nearby hill and there he told her again that he had shot Carl and that he said he wondered if Carl was still alive, that then about 6 a.m. they began walking and hitchhiked rides from Thomas G. Walker, who took them to Portland, and from about six others until on Thursday, August 18th, they reached a farmhouse in Lakewood, Wayne County, at least 160 miles from Philadelphia, occupied by a family named Williams, that she went with

him willingly "from the period they were hitchhiking" according to a statement she later made to a policewoman, because she loved him and wanted to be with him, that she believed John told the Williamses that they had run away in order to get married, that she did not tell Mr. and Mrs. Williams anything about Carl, that defendant and Schnur stayed in a barn Thursday night and in the house Friday night, Schnur having asked and received permission from Joseph Kulesza, a tenant of Williams, and that Mr. and Mrs. Williams gave them Friday night dinner and breakfast the next morning, that Mrs. Kulesza spoke with the postmaster about the matter and he called the State police who came and arrested John and defendant.

It is clear from defendant's own testimony at a former hearing, and from the testimony of the Commonwealth's witnesses, that all of the activities of defendant and Schnur after the killing were instigated and directed by Schnur. In the words of a disinterested policewoman, to whom defendant related the story, defendant at first protested about going with John at all, in fact refused to go, and later, as far as concerned going to and staying at the farm, she was only "agreeable" to the same. It appears affirmatively in the notes of testimony at a number of places that she made no statements and took no action with a view to obtaining food, shelter or escape from detection for John. It also appears affirmatively that she did not avail herself of ample opportunity to tell a number of people about the shooting of Carl.

"The common-law definition of misprision of felony is the criminal neglect either to prevent a felony or to bring the offender to justice after its commission, but without such previous concert with or subsequent assistance to the principal offender as would make the concealer an accessory": Wharton's Criminal Law, vol. 2, p. 2223.

"At common law a party is guilty of misprision of felony who stands by during the commission of the felony without endeavoring to prevent it, and who, knowing of its commission, neglects to prosecute the offender": Op. cit., vol. 1, p. 376. See also 16 C. J., page 60.

It is noteworthy that the only American decision cited in Corpus Juris is State v. Wilson, 80 Vt. 249, 67 Atl. 533 (1907). To this Wharton adds State v. Biddle, 32 Del. 401, 124 Atl. 804 (1923). The fact that such "offense" was not specifically included in the detailed and voluminous Penal Code of Pennsylvania would indicate that there is no such offense in this Commonwealth. Neither our research nor that of counsel has uncovered a single reported case in the more than 175 years since the Nation became independent in which a defendant has been convicted in this Commonwealth of such crime. Even if there is such a crime, it is highly questionable whether a child the age of 16 should be prosecuted under the facts herein. The crime would appear to be one of concealment on the part of a mature person rather than on the part of a juvenile. Overlooking this phase of the matter, which may be debatable, we must inquire whether there then is any credible evidence that defendant criminally neglected to bring the murderer to justice after the offense was committed.

To convict a defendant of such criminal neglect a jury would have had to find that she knew that Schwarz had been murdered. Assuming that defendant realized Carl's dead body lay in the truck, we find no evidence that she knew that John had feloniously killed him. Before the killing, Carl and John had been intimate friends; defendant knew of no reason why one should wish to kill the other. The killing might have been accidental or in self-defense for all that defendant knew, or so it appears from the testimony.

Defendant's behavior was extremely foolish even for a child, but in our judgment a jury should not be allowed to draw inferences adverse to an infatuated teenage girl from the fact that, like a dog following her master, she accompanied her boy friend to his one-time summer resort and spent part of the time with him there for a day or so until they were arrested.

Defendant also has been indicted as an accessory after the fact to murder.

"An accessory after the fact is one who, knowing a felony to have been committed by another, receives, relieves, comforts or assists the felon, or in any manner aids him to escape arrest or punishment . . . he must know of the felony having been committed, and that the person aided is the party who committed it, and intend to shield him from the law": Commonwealth v. Costa and Tucci, 2 D. & C. 612, 613 (1922).

Assuming, contrary to fact, that the Commonwealth had proven that defendant knew that a felony had been committed, it failed to show that she received, relieved, comforted or assisted John Schnur, or in any manner aided him to escape arrest or punishment. She originally went with John to "get a custard". She went on a ride in which she was frightened and in which she was taken against her will to the vicinity of Washington's Crossing, where purposely or otherwise John damaged the truck and frightened her. John may have told the Williams' that he and defendant had run away to get married, and defendant may have known of this. As a matter of fact it appears that the only reason she went with John as far as she did was that she loved him, and as she stated to Stella Donahue, the policewoman, she "wanted to stay with him, still hoping to get married". Manifestly she stayed with him out of love and a desire to be married. Even in felonies, "mere knowledge of the perpetration of a crime does not involve responsibility for its commission, nor does

silence following such knowledge make one an accomplice or an accessory after the fact": Commonwealth v. Giacobbe, 341 Pa. 187, 195 (1941). Not one case has been cited by the Commonwealth which bears the slightest resemblance to the facts of this case, in which a conviction has been sustained.

As to both bills of indictment: "The difficulty that confronts the Commonwealth is that . . . a case was not made out on the testimony actually received. Viewing it only, the trial judge had no alternative than to sustain the demurrer": Commonwealth v. Frank, supra, p. 278.

And now, this April 11, 1956, the exceptions to the order of the trial judge sustaining the demurrer as to both bills of indictment are dismissed.