## Commonwealth v. Gill, Appellant.

Argued March 12, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Daniel J. Shern,* for appellant.

*Charles C. Gordon,* with him *James W. Tracey, Jr.,* Assistant District Attorneys, and *Charles F. Kelley,* District Attorney, for appellee.

PER CURIAM, December 11, 1935:

On Christmas Eve, 1933, a right-angled collision occurred in Philadelphia between a taxicab driven by the appellant, Harry Gill, and a Buick sedan owned and operated by one Joseph Weiss. As a result the taxicab overturned and caught fire; two passengers therein, Joseph Hawkins and Oliver Robinson, died from the

burns then suffered. Gill and Weiss were jointly indicted for involuntary manslaughter as to each passenger; they were tried together and convicted in both cases. Weiss' motions for a new trial were granted.

The court below denied Gill's similar motions and sentenced him upon the indictment relating to the death of Hawkins; hence the present appeals.

We are not advised as to the grounds upon which Weiss was granted new trials. The substantial question arising upon a review of the whole record is whether we should direct a retrial of the cases against Gill, by reason of that portion of the charge in which the learned trial judge defined and described the degree of negligence requisite to sustain a conviction of involuntary manslaughter.

None of the witnesses saw the actual contact of the colliding vehicles, but several heard the crash and saw the burning taxicab before it upset. There was ample evidence that the collision occurred in this manner. Appellant was driving his cab east on Diamond Street, and Weiss was driving north on 13th Street. In the right-angled intersection of these streets the left front of the Weiss car collided with the right rear of the taxicab. The latter vehicle continued beyond the intersection, burst into flames, made a semi-circular turn in the middle of Diamond Street, and came to rest facing in the direction from which it had come and lying on its left side, with its wheels on the sidewalk and roof in the street, the back of the cab resting against a fire plug seventeen feet from the intersection. The Weiss car was stopped in the middle of the intersection, facing northeast, its front wheels about on a line with the north curb of Diamond Street and so close to the burning cab that it was necessary to "shove [it] out of the way."

Appellant argues that the total effect of the evidence is merely to show the occurrence of the collision, and

that this alone is not enough to support the charge against him. The principle upon which he relies—that the mere happening of a collision neither proves nor raises a presumption of negligence—is well settled: Sajatovich v. Traction Bus Co., 314 Pa. 569, 172 A. 148. But it is equally well settled that the attendant circumstances may supply the evidence of negligence. As was stated in Tucker v. Pittsburgh, etc., Ry. Co., 227 Pa. 66, 69, 75 A. 991,—a civil suit for damages,— "Accidents in which life is lost not infrequently occur unwitnessed. Such fact in itself does not operate to protect one whose negligence can be shown from the general situation and circumstances to have been the operative cause. When these are such as to satisfy reasonable and well-balanced minds that the accident resulted from the negligence of the party charged, liability attaches." See also Ferry v. P. R. T. Co., 232 Pa. 403, 81 A. 426; Miller v. Siebert, 296 Pa. 400, 145 A. 909; Reardon v. Smith, 298 Pa. 554, 148 A. 860; Butler v. Del Favero, 116 Pa. Superior Ct. 534, 176 A. 765, and cases there cited. Such attendant circumstances were shown in this case. We do not mean to imply that the *measure of proof* in civil and criminal cases is the same.

In the course of his charge the learned trial judge used this language: "But life is so respected by law, ...... that when a life is lost, even though there is no criminal intent, if it is lost through *any* lack of care only, on the part of another, that is called involuntary manslaughter.

"It is not murder, it is not voluntary manslaughter, because it was not the will of the person to do it, but it is involuntary manslaughter, which is the lowest form of homicide known in the law.

"Therefore, with that explanation of the term, involuntary manslaughter is committed by one, entirely unintentionally of course, if death results to another by

reason of *any* breach of duty on his part, *any* lack of care—it does not make any difference *how slight* that lack of care may be, if that death results from such lack of care or inattention to duty, that is involuntary manslaughter.

"In other words, to distinguish it somewhat from the case that was heard this morning, and some of you members of the jury may have heard some of the charge in that case, it is entirely different from a case of assault and battery by automobile. Curiously, it takes very much more proof to prove an assault and battery by automobile than it does to prove an involuntary manslaughter, though in one case it is only an injury and in the other case a death, which results.

"You have to show, in effect, either an intention to do wrong or such gross recklessness as to amount to an intention before you can convict a man of assault and battery by automobile, but it is just the contrary when it is involuntary manslaughter, because the life of its citizens is held dear by the Commonwealth, and therefore the *slightest* act of negligence, if it results in death, is a basis for holding a man for involuntary manslaughter whereas to convict a man of assault and battery by automobile you have to have a great deal of evidence about recklessness, terrific speed, disregard for social duties and so forth, amounting to wantonness." (Italics supplied.)

At the conclusion of the charge and before the jury retired, counsel for appellant directed the attention of the trial judge to the repeated use of the words "any" and "slightest." In the absence of any modification, a specific exception was taken to that portion of the charge.

The jury was thus instructed that if appellant was guilty of the slightest negligence, or any lack of care, however slight, resulting in death, he could be convicted of involuntary manslaughter.

The law is otherwise. We are, of course, dealing with the defendant's *criminal* liability,—not his *civil* liability for damages.

Sir Michael Foster in his Crown Cases,[1] (p. 264) said with reference to this subject—manslaughter, in the doing of an unlawful act—*(italics by him):* "The law in these cases doth not require the *utmost* caution, that *can be* used; it is sufficient that a reasonable precaution, what is *usual and ordinary* in like cases be taken." And the editors of the first American Edition of Hale's Pleas of the Crown (Stokes & Ingersoll), p. 477, note to p. 475, said: "The law does not require that the utmost caution be used; it is sufficient that a reasonable precaution, what is usual and ordinary in the like cases, be taken; such as hath been found by long experience in the course of human affairs to answer the end, for such conduct shows that the party was *regardful of social duty and free from any manner of guilt.*" (Italics ours.) See also Com. v. Godshalk 76 Pa. Superior Ct. 500, 503, where this court, in sustaining a conviction for involuntary manslaughter said that the defendant's conduct was "not the exercise of reasonable or ordinary care in the use of [the highway] and [was] a failure to perform a duty imposed by law."

Because of the frequency of prosecutions for involuntary manslaughter and the severity, in certain circumstances, of the punishment—fine, not exceeding $1,000, *and (conjunctively)* imprisonment, not exceeding three years[1½]—we think it proper to give the subject somewhat fuller consideration than it has received.

Originally, in this Colony and State, as at common law in England, there was no distinction between voluntary and involuntary manslaughter, as respects indictment and sentence. Both were embraced under the

[1]Third Edition (1792) State Library.

[1½] See Act of April 11, 1929, P. L. 513.

28

term, manslaughter, and punishable as a felony, *within* benefit of clergy. Manslaughter was defined in Hale's Pleas of the Crown (Vol. 1, p. 466)[2] as "the unlawful killing of another without malice, either express or implied." And in "A Methodical Summary of Pleas of the Crown" by St. Matthew Hale,[3] as, "Killing another upon a sudden falling out, or provocation, or unjustifiable act." William Hawkins, in his Pleas of the Crown,[4] defines manslaughter to be "such killing as happens in a sudden quarrel, or in the commission of an unlawful act, without any deliberate intention of doing any mischief at all" (chap. 30, §1, p. 76). This was adopted as the definition in Bacon's Abridgment, Vol. 7, p. 183.[5] It differed from homicide *per infortunium*, or by misadventure, in that in the latter, death ensued accidentally as a result of a *lawful* act, done without intention of bodily harm to any person (1 Hale's Pleas of the Crown, p. 472).

By Act of April 22, 1794, 3 Sm. L. 186, "manslaughter" was divided into two classes, "voluntary manslaughter," (§7), and "involuntary manslaughter, *happening in consequence of an unlawful act*" (§8), (italics ours) and it was provided as to the latter that "it shall and may be lawful for the Attorney General, ...... with leave of the court, to waive the felony, and to proceed against and charge such person with a misdemeanor, and to give in evidence any act or acts of manslaughter; ...... or the said Attorney General ...... may charge both offenses in the same indictment, in which case the jury, may acquit the party of one, and find him guilty of the other charge." This

---

[2]Wilson's Edition (1778) in Lancaster Law Library; 1st American Edition (Stokes & Ingersoll) in Philadelphia Law Library.

[3]Published in 1694—now in the Lancaster Law Library.

[4]Third Edition (1739) in State Library.

[5]7th Eng. Edition, 1854, in Lancaster Law Library.

was substantially reenacted in section 79 of the Criminal Code (Act of March 31, 1860, P. L. 382, section 79) under which the indictments in these cases were brought.

The Act of 1794, supra, was considered by the Supreme Court in Com. v. Gable, 7 S. & R. 422, (by typographical error referred to in the opinion as the Act of April 22, 1784). In that case two defendants indicted for murder, were found guilty of manslaughter, and the question before the court was whether it was voluntary manslaughter or involuntary manslaughter. A majority of the court, speaking through Chief Justice TILGHMAN, (Mr. Justice GIBSON dissented), held that it amounted to a conviction of voluntary manslaughter. Chief Justice TILGHMAN construed the definition of involuntary manslaughter in the Act of 1794, "happening in consequence of an unlawful act," in accordance with the views of the best authorities in England, based on the prior relevant decisions of the courts, so as to apply to and embrace not only accidental death caused by *an unlawful act,* but also accidental death caused by "an act not strictly lawful [unlawful?] but done in an unlawful manner and without due caution." This was in substantial accord with Sir William Blackstone's discussion following his definition: "Manslaughter is therefore thus defined; the unlawful killing of another without malice either express or implied; which may be either voluntarily, upon a sudden heat, or involuntarily, but in the commission of some unlawful act" (4 Comm. 191). Blackstone seems to have been the first to make formal division of manslaughter into two classes, voluntary and involuntary;[6] and treating of the latter, said: "The second branch, or *involuntary* manslaughter, differs also from homicide excusable by misadventure in this,—that misadventure always happens in conse-

---

[6]Andrew Amos' Ruins of Time Exemplified in Sir Matthew Hale's Pleas of the Crown (1856), p. 135 (State Library).

quence of a lawful act, but this species of manslaughter in consequence of an unlawful one. As, if two persons play at sword and buckler, unless by the king's command, and one of them kills the other, this is manslaughter, because the original act was unlawful, but it is not murder, for the one had no intent to do the other any personal mischief. So, where a person does an act lawful in itself, but *in an unlawful manner, and without due caution and circumspection,* (italics ours), as when a workman flings down a stone or piece of timber into the street and kills a man, this may be either misadventure, manslaughter, or murder, according to the circumstances under which the original act was done; if it were in a country village where few passengers are, and he calls out to all people to have a care, it is misadventure only; but if it were in London, or other populous town, where people are continually passing, it is manslaughter, though he gives loud warning, and murder if he knows of their passing and gives no warning at all, for then it is malice against all mankind." (4 Comm. 192).

This language was based largely on the discussion of the subject in Hale's Pleas of the Crown,[7] Hawkins' Pleas of the Crown,[8] Foster's Crown Cases[9] and Sir John Kelyng's Report of Cases in Pleas of the Crown.[10]

From an examination of these authorities and the cases referred to in them which are set out and dis-

---

[7]Vol. 1, pp. 472-475, with references to the Year Books.

[8]Chap. 29, Sec. 9, p. 74 of 3d Edition (1739); 8th Edition (Curwood) in Philadelphia Law Library, Vol. 1, chap. XI, p. 85.

[9]In State Library, pp. 258-264.

[10]Ed. of 1789, p. 40, 41 (Lancaster Law Library); English Reports Reprint, Vol. 84, K. B. 13 (State Library). This citation appears correctly (Kel. 40) on page 192 of Vol. 4 of Blackstone's Commentaries, note g, in Christian's Edition (1822). It is incorrectly cited as 'Kes. 40,' in the said note in Dean's American edition (1836), Sharswood's Edition (1860, 1861, 1863, 1873 and 1877) and Lewis' Edition (1897).

cussed at some length, (*inter alia,* Sir John Chichester's Case, 1 Hale P. C. 472, 473—Foster, 260; Hull's Case, Kelyng 40, 41—Foster, 263), it appears that the act causing death was either (1) unlawful, that is, forbidden by law, but not amounting to felony, or (2) was so careless, negligent and reckless as to approximate unlawful conduct, or doing an act in an unlawful manner. Under the second classification, unless the element of rash or reckless conduct was present, it was only *per infortunium,* or by misadventure. In Kelyng 40, 41, the throwing down of a piece of timber by a workman on the highway in London, or other populous place was likened to the case "where a man shoots an arrow or gun into a market place full of people, if any be killed it is manslaughter." Hawkins in his Pleas of the Crown[11] in discussing 'manslaughter' says: "But for the learning relating to this head, being for the most part coincident with that of others, it will be superfluous to inlarge on it here; and therefore I shall refer the reader to other chapters for the particular case, as to ...... Chapter 29, from section 6 to section 13, for such as fall out in the execution of a *rash, unlawful* action." (Italics ours.) And referring to section 9 of the previous chapter (29), we find: "But if a person kill another by shooting at a deer, etc., in a third person's park, in the doing whereof he is a trespasser; or by shooting off a gun, or throwing stones in a city or highway, or other place where men usually resort; or by throwing stones wantonly in play, which is a *dangerous* sport, and has not the least appearance of any good intent; or by doing any other such idle action as cannot but indanger the bodily hurt of some one or other; or by tilting or playing at handsword without the King's command; or by parrying with naked swords covered with buttons at the points, or with swords in scabbards, or such like *rash* sports, which

[11]Chap. 30, Sec. 3 (3d Ed. 1739).

cannot be used without *manifest hazard of life* he is guilty of manslaughter." (Italics ours.)

And Sir Michael Foster, in concluding his discussion of the subject (pp. 263, 264) said: "I cannot help saying, that the rule of law I have been considering in this place, touching the consequence of taking or not taking due precaution, doth not seem to be sufficiently tempered with mercy. Manslaughter was formerly a capital offence, as I shall hereafter shew; and even the forfeiture of goods and chattels upon the foot of the present law is an heavy stroke upon a man guilty, it is true, of an *heedless incautious conduct,* but *in other respects perfectly innocent*; and when the rigour of law bordereth upon injustice, mercy should, if possible, interpose in the administration" (italics ours).

This element of rash or reckless conduct is somewhat differently expressed in Bouvier's Law Dictionary (2 Rawle's Revision 2085), citing McClain's Cr. L. §335, where the second class or division of involuntary manslaughter is defined: "Where it results from the negligent doing or omission of an act, which though not in itself wrongful, *was attended by circumstances which endangered life."* (Italics ours.)

In some jurisdictions this element of rash or reckless conduct is called culpable negligence, or criminal negligence.[12] In this State the word 'reckless' has frequently been used. For example, in Com. v. Micuso, 273 Pa. 474, 478, 117 A. 211, a prosecution for murder, resulting in a verdict of guilty of voluntary manslaughter, Mr. Justice WALLING speaking for the court said: "Death caused by recklessly driving a motor vehicle, or by carelessly discharging a firearm in a populous place, are examples of involuntary manslaughter, but to intentionally run down or shoot a citizen causing his death, is a higher offense." In Com. v. Mayberry, 290

[12]Blackstone used the term 'criminal negligence' in his Commentaries, Book 4, page 192, note (i).

Pa. 195, 138 A. 686, where the Supreme Court reversed a conviction of murder in the second degree, and held that the facts warranted a conviction of no higher crime than involuntary manslaughter, the defendant was operating his automobile at an *unlawful* speed, (pp. 197, 199); and in Com. v. McLaughlin, 293 Pa. 218, 142 A. 213, where the facts were very similar to the last cited case, the defendant's negligent conduct was so reckless that Mr. Justice SIMPSON, in a dissenting opinion, concurred in by the Chief Justice, contended that the verdict of murder in the second degree should have been upheld.

In Com. v. Godshalk, 76 Pa. Superior Ct. 500, 503, we sustained a conviction of involuntary manslaughter resulting from a motor vehicle running over a child, and said: "There can be no controversy as to our decisions in regard to such a case. Reckless driving upon the highway is not the exercise of reasonable or ordinary care in the use of it and is a failure to perform a duty imposed by law."

In Com. v. Ochs, 91 Pa. Superior Ct. 528, where this court upheld a conviction for involuntary manslaughter, caused by an unlawful use of the highways contrary to the motor vehicle acts, (p. 530), the court below had refused to charge, as requested by the defendant, that in order to convict, the jury must find the defendant guilty of gross negligence; and that "to constitute gross negligence, an act must be so wanton and reckless, as to evince an utter disregard for the safety of others, and *necessarily imply an intent to injure."* We said, speaking through Judge LINN—now a Justice of the Supreme Court: "The court instructed the jury that appellant could not be convicted, unless the jury found from the evidence beyond a reasonable doubt that appellant operated his automobile in a careless, negligent or reckless manner, without due regard to the circumstances present. We understand, with the

appellant, that the words, 'careless, negligent or reckless' so used in the charge are synonymous." This implies, as we read it, that carelessness or negligence resulting in death in order to be indictable as involuntary manslaughter, must have present in it an element of recklessness. The word, 'reckless' usually imports something more than 'careless' or 'negligent.' It denotes rather 'rashly negligent, utterly heedless' (Webster).

We think, in the light of the history of this offense, that the phrase 'an act done in an unlawful manner and without due caution,' used as it is, conjunctively, implies along with negligence a certain element of rashness or recklessness, which, in the eyes of the law, approximates an 'unlawful act.' For it must not be overlooked that however involuntary manslaughter may be defined in other states, the Criminal Code of this State speaks only of 'involuntary manslaughter happening in consequence of an unlawful act.'

Were it otherwise, a householder who negligently leaves a depression or small hole in his sidewalk caused by a loose brick or some uneven paving, would be guilty of involuntary manslaughter if a pedestrian stumbled because of it and fractured his skull, causing death. Plainly the remedy in such case would be civil not criminal. On the other hand, if one in reckless disregard of the rights of pedestrians, leaves a deep trench across his sidewalk unguarded, and a pedestrian falls into it and is killed, he might be convicted of involuntary manslaughter, for he was not regardful of his social duty nor free from guilt. Such negligence would have in it an element of recklessness and might properly be called culpable negligence.

The point was forcibly expressed by the Supreme Court of Indiana in State v. Dorsey, 20 N. E. 777. There, after defining involuntary manslaughter to be "whoever kills any human being without malice ...... involuntarily, but in the commission of an unlawful

act," the court sustained a verdict of guilty of involuntary manslaughter where a railroad engineer carelessly and negligently ran his engine into a passenger car thereby causing the death of a passenger, but said: "We do not mean to be understood as holding that every careless or negligent act whereby death ensues constitutes manslaughter. Far from it. To constitute manslaughter the act causing death must be of such character as to show a wanton or reckless disregard of the rights and safety of others, but not necessarily an act denounced by the statute as a specific crime" (p. 778). Of course, it must not be so wanton or gross as to imply an *intent* to injure, for as pointed out by Judge LINN in Com. v. Ochs, supra, p. 532, that would amount to *felonious* homicide, for the fundamental element of involuntary manslaughter is that it must be unintentional, accidental, involuntary.

Of course, in this discussion, we have paid little attention to the first class of cases of involuntary manslaughter, viz., where one while doing an unlawful act, accidentally kills another; for in such case, the degree of negligence, if any, is not important. If the act is unlawful,—that is, is forbidden by law, illegal, contrary to law,—and the death of another results as a consequence of it, it constitutes involuntary manslaughter,

Death resulting from some motor vehicle accidents may constitute involuntary manslaughter, not because death was caused by negligence, with an element of rash or reckless conduct present, but because it resulted from a violation of a statute which made the act causing death unlawful,

In a case falling under the second class of the definition of involuntary manslaughter, where it is alleged that death resulted from the doing of an act "lawful in itself, but done in an unlawful manner and without due caution and circumspection," it is impracticable to at-

tempt to define the exact degree of negligence that must be shown in order to sustain a conviction, but there should be present some element of rash or reckless conduct, which approximates acting in an *unlawful* manner.

We, therefore, hold that the court below erred in charging the jury that they should convict appellant if they found that the deaths in question had resulted from *any* breach of duty on his part, *any* lack of care, the *slightest* negligence; that they should, rather, have been instructed that they could convict defendant only if from all the evidence they found, beyond a reasonable doubt, that he operated his automobile in a careless, negligent and reckless manner and without due regard to the circumstances, and consequently, in the mind of the law, in an unlawful manner; and that the death, or deaths, resulted therefrom.

We think the Commonwealth submitted sufficient evidence to take the cases against appellant to the jury, but we are also of opinion that the instructions to which we have referred were so erroneous and misleading as to require that the charges against him should be retried.

Judgments reversed with a venire.