## Commonwealth *v.* Samson, Appellant.

Argued  October  13,  1937.

Before KELLER, P. J.,

Cunningham, Baldrige, Stadtfeld, Parker, James, and Rhodes, JJ.

*William A. Gray,* with him *David N. Feldman* and *I. Weisburg.*

*Earl Jay Gratz,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

Opinion by Baldrige, J., January 27, 1938:

On the night of December 19, 1936, a three-story brick dwelling situate at 519 South 15th street, Philadelphia, conducted by the appellant as a tenement house, collapsed, carrying with it adjoining premises No. 517. A fire immediately followed and seven lives were lost. Seventeen people were in building No. 519, fourteen of whom lived there. Samson, the appellant, was indicted on seven bills, each charging involuntary manslaughter, was tried, and convicted. These appeals followed.

The appellant's assignments of error relate principally to (1) failure of the court to direct a verdict of not guilty; (2) admission of certain testimony; and (3) refusal to grant a new trial.

The appellant leased No. 519 for a term of three years from January 1, 1937, as a rooming house for colored people. The lease, dated August 6, 1936, provided that, in consideration of the low rental of $20 per month, Samson was to take the premises "as is," and, at his own cost, put and keep the interior in good order and repair,

"as well as to make improvements......The Lessee in addition to making all necessary repairs required by reason of his 'as is' obligation, expressly agrees to have at his own cost and expense, the hereinbelow listed repairs done and completed by November 1st, 1936."

The appellant took possession of the property and made the specific repairs, consisting of certain carpenter work, plastering, painting, etc., which were completed by November 1, 1936, thus giving him an opportunity to reimburse himself for part of the expenses incurred. We think the terms of the lease clearly disclose that, in consideration of the low rental and obtaining possession of the building before the time he was to pay rent, lessee was not only to make interior repairs, but he was to take the building "as is" and also make such improvements as were required so that it would be safe in general for the purpose for which it was rented. This he did not do.

Samson did not apply for a license to conduct these premises as a tenement house, as required by the Act of June 7, 1907, P. L. 441 (53 PS §4051 et seq.), which provides for an inspection of a building by the duly constituted health authorities, compliance with certain standards, and payment of a fee. He was aware of the legal requirements to conduct a tenement house, as he had one on 13th street for which he had applied for a license. If he had made application for a license for the 15th street property, it is reasonable to assume it would not have been granted, as an inspection would have disclosed that the building, its facilities, and the manner of its occupancy did not meet the requirements of the Act of June 11, 1915, P. L. 954 (53 PS §3851 et seq.). Under the 31st section thereof (53 PS §3943), the Chief of the Division of Housing and Sanitation may require the vacation of buildings which are being operated in violation of law or which are unfit for human habitation or dangerous to life and health. One of the important purposes of this legislation is to protect poor people living in tenements from unsanitary and overcrowded conditions; another is to require

that buildings be made safe and habitable, so as to prevent such a disaster as occurred here.

Under the Commonwealth's proof, these premises were in such a dangerous and defective condition as to be unsafe for habitation. The tenants testified that the walls of the building bulged; brick and mortar were missing, thereby causing gaping holes; plaster was falling; water ran from floor to floor; the baseboards were six inches from the walls and exposed the bricks; appellant visited the premises three or four times a week; his attention was called to the conditions prevailing and he promised to make repairs.

Elijah Bellony, a carpenter, testified that when he inspected the building, in pursuance of a request to give appellant an estimate on fixing the windows, doors, and cellar steps, he found the entire house in a badly dilapidated condition; that when he called appellant's attention to the condition of the walls he told the witness to "forget it."

Another carpenter, Abraham Riley, testified that upon an inspection he made he saw a five or six-inch bulge in the side, or alley wall, from which bricks and mortar were missing.

Acting Fire Marshal Ebald testified that he reached the scene of the collapse shortly after the fire broke out, and upon investigating he found the four walls had collapsed. He attributed the cause thereof to their defective condition and the overloading of the premises. Other officers of the fire department gave testimony to the same general effect.

George Siegrist, Supervisor of the Bureau of Building Inspection, stated that from an examination he made after the destruction of the building, he was of the opinion that the foundation of the party wall had proved defective, which caused the other walls to drop. His testimony was not in entire accord with that of other Commonwealth witnesses who testified that the

middle of the party wall had buckled and first gave way.

The testimony offered upon the part of the Commonwealth was categorically denied by the defendant. He disclaimed knowledge of the structural weakness of, or other defects in, the building, and denied that the appearance of the walls indicated a possibility of a collapse, or that he was aware of the number of people in the building, or that complaints had been made by the tenants to him of the condition of the premises. He maintained that the actual cause of the collapse was the disintegration of the foundation of the party wall, for which he was not responsible. He was corroborated to some degree concerning the condition of the building by the artisans who did the plumbing, painting, plastering, etc. A number of these witnesses, however, stated they had made no special observation of the walls or structural conditions of the property, but merely performed the duty of making the repairs for which they had been employed.

The Commonwealth offered ample evidence to submit to the jury the questions concerning the condition of the walls, appellant's knowledge thereof, and the cause of the building's collapse. The issues of fact were clearly presented to the jury in a charge to which only a general exception was taken by appellant.

The defendant argues strenuously that his omission to obtain a license, although an unlawful act, was not malum in se, but merely malum prohibitum, and that it was not the proximate cause of death, or, in other words, that there was no causal connection between the act and the deaths; and, further, that there was no proof that he was guilty of gross and culpable negligence.

The distinction between malum in se and malum prohibitum was not raised in the court below or discussed by the judge in his charge. No case has been cited, and we have found none, which holds, unqualifiedly, that to constitute involuntary manslaughter the unlawful act must be malum in se and not merely malum prohibitum. There

is an historical basis for the distinction between these offenses, but modern decisions recognize little, if any, difference. The judicial use of these terms appears as far back as 1490, when the English courts limited the power of dispensation of the crown to grant leave to individuals to commit an offense malum prohibitum but not one malum in se. Their origin, as suggested by some writers, is probably ecclesiastical. A short summary of the historical basis for the distinction is given in 30 Columbia L. Rev. 74. The dissimilarity in the offenses is also discussed in 1 Blackstone's Commentaries 54, 57. The disparateness was followed by the earlier writers and carried over into the law of homicide: 1 Hale P.C. 39; Wharton on Homicide, 3d ed. (1907), p. 336, §213; 1 Bishop on Criminal Law (1923), §331.

There was a sound basis for the common law discrimination between acts malum in se and malum prohibitum, which does not prevail now; for in Blackstone's time there were approximately one hundred and twenty offenses punishable by death. In modern times, punishment is supposed to "fit the crime." One of the primary objects of our negligence laws is the protection of the public. If an act is dangerous to human life, we can see no reason why the guilt should be based only on moral turpitude arising from a violation of what Blackstone termed a "superior law." This is especially true, in view of the great number of deaths and injuries due to a violation of speed, traffic, and other laws designed to protect the public, which constitutes but malum prohibitum. In *State v. McIver* (N. C.), 94 S.E. 682, 684, where defendant was convicted for death resulting from the operation of his automobile in violation of the speed limits, the court well said:

"It is, however, practically agreed, without regard to this distinction, that if the act is a violation of a statute intended and designed to prevent injury to the person, and is in itself dangerous, and death ensues, the person violating the statute is guilty of manslaughter at least, and, under some circumstances, of murder."

In *Com. v. Ernesto et al.*, 93 Pa. Superior Ct. 339, and *Com. v. Mango*, 101 Pa. Superior Ct. 385, the defendants were convicted of involuntary manslaughter for deaths occasioned by the explosion of a still being unlawfully operated by them. The question whether the act was malum prohibitum or malum in se was not raised or referred to in either case. As is pointed out in 29 C.J. p. 1153, §139, a conflict has existed as to the extent to which the distinction should be carried. It is there said:

"According to some authorities, an unintentional homicide committed in the commission of an unlawful act which is merely malum prohibitum is not involuntary manslaughter, within the meaning of the rule hereinbefore discussed. In other decisions, the rule has been applied, although the act was merely malum prohibitum, particularly where it was in violation of a statute intended and designed to prevent injury to the person; and it has been said that the cases in which an act merely malum prohibitum has been held a sufficient basis for a charge of involuntary manslaughter have been those in which the act which is unlawful is accompanied by negligence and reckless disregard of the safety of others, although this statement is apparently not borne out in all instances by the language of the decisions. Where the act of the defendant is not only in violation of statute, but is also negligent and careless, there is no conflict in the decisions as to his guilt of manslaughter if the death of another results."

In the latest edition of Wharton on Criminal Law (1932) vol. 1, §157, note 10, the difference adhered to in the earlier edition is discredited:

"The distinction taken in the old books between malum in se and malum prohibitum in this relation is now exploded. A man who inflicts injury incidentally to attempting a statutory crime is, in the reasoning of the text, as responsible as is the man who inflicts injury incidentally to a common law crime.

Furthermore, there was a causal connection between the appellant's negligence to perform his legal duty and the collapse of the building. We agree with the statement of the learned court below: "Had the law not been vio-lated, the subsequent happenings could not have occurred." The omission to perform a legal duty is indictable. If resulting death is the natural and probable consequence of one's act, he is responsible: Wharton on Criminal Law (1932) vol. 1, p. 255, §198.

Even if we assume that the appellant's failure to obtain a license to operate these premises as a tenement house does not constitute a basis for a conviction of manslaughter, the verdict, in our judgment, can nevertheless be sustained, as there was sufficient evidence of negligence, with elements of recklessness in disregarding the safety of the occupants, to constitute culpable negligence.

There has never been in Pennsylvania a complete statutory definition of "involuntary manslaughter." The earliest statute—Act of April 22, 1794 (3 Sm. L. 186), as well as the Criminal Code of March 31, 1860, P. L. 382, §79 (18 PS §2226), merely refers to "involuntary manslaughter, happening in consequence of an unlawful act." Our courts, however, have clarified the meaning of this term.

In *Com. v. Mayberry*, 290 Pa. 195, 138 A. 686, the Supreme Court cited, with approval, the definition of "involuntary manslaughter" given in 29 C.J. p. 1148:

".... involuntary manslaughter consists in the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty."

The word "negligently," as used therein, must be construed as applying to conduct involving an element of recklessness. The facts in that case show that defendant's guilt was not confined to simple negligence. The unlawful speed at which he was travelling in an automobile as he

approached and attempted to negotiate a curve indicated reckless conduct on his part.

That case and others were cited and considered in *Com. v. Gill*, 120 Pa. Superior Ct. 22, 182 A. 103, which contains an extended discussion of the scope and meaning of the phrase "unlawful conduct," as used in our criminal negligence laws. We there said (p. 34) :

"We think, in the light of the history of this offense, that the phrase, 'an act done in an unlawful manner and without due caution,' used as it is, conjunctively, implies along with negligence a certain element of rashness or recklessness, which, in the eyes of the law, approximates an 'unlawful act.' "

To support an indictment for involuntary manslaughter, there must be present the ingredient of recklessness. By way of illustrating our view of the difference between simple and criminal negligence, we pointed out, in the Gill Case, that if there is a depression in a sidewalk and a person stumbles because of it and fractures his skull, causing death, the one responsible would not be guilty of involuntary manlaughter, for there is an absence of rashness or culpable negligence. "On the other hand, if one in reckless disregard of the rights of pedestrians, leaves a deep trench across his sidewalk unguarded, and a pedestrian falls into it and is killed, he might be convicted of involuntary manslaughter, for he was not regardful of his social duty nor free from guilt. Such negligence would have in it an element of recklessness and might properly be called culpable negligence" (p. 34). We did not attempt there to point out the distinction between malum in se and malum prohibitum, as that question was not involved, but we did say (p. 35) :

"Of course, in this discussion, we have paid little attention to the first class of cases of involuntary manslaughter, viz., where one while doing an unlawful act, accidentally kills another; for in such case, the degree of

negligence, if any, is not important. If the act is unlawful, —that is, is forbidden by law, illegal, contrary to law,— and the death of another results as a consequence of it, it constitutes involuntary manslaughter."

The appellant's conduct, under proof offered by the Commonwealth, was not only a violation of the statutes, but it was so dangerous and disregardful of his social duty as to be sufficient upon which to base a conviction of involuntary manslaughter.

Appellant's next contention is that the lower court erred in admitting the testimony of Ebald, who stated that from his investigation and *from statements taken from the witnesses* the collapse of the building was due to overloading and the defective condition of the walls. That testimony was received without objection. The question of its admissibility is raised in this court for the first time. If objection had been made at the trial, the Commonwealth would have had an opportunity to meet it. The Commonwealth should not be prejudiced by the defendant's tacitly agreeing to the reception of this testimony. The decisions uniformly hold that appellate courts will not consider matters that have not been raised in the court below : *Hanley v. Waxman,* 80 Pa. Superior Ct. 274; *Com. v. Popp et al.,* 87 Pa. Superior Ct. 193. This testimony, however, did not materially strengthen the Commonwealth's case. It added nothing to what was already of record, and did the defendant no such harm as would warrant a new trial for that reason.

Appellant complains, also, of the admission of testimony of witness Riley, on the ground that he was not qualified as an expert to express an opinion that the building was in such a condition that it could not be readily repaired so as to be made tenantable and safe. Riley testified that he was a carpenter, with forty-three years' experience, had made many alterations and additions to buildings and had put up several buildings, although none since 1923, his business since then being merely alterations and additions. Whether the condition of the build-

ing was such that it could not have been repaired for safe occupancy, was a matter which one with special knowledge and experience could determine better than the average person. Qualifications to express an expert opinion are largely within the discretion of the trial judge, and, in this instance, we find no abuse of that discretion.

The last position taken by the appellant is that certain after-discovered evidence warranted the granting of a new trial. This contention based upon an affidavit made by William V. Proper, of the Termite Control Company, wherein he set forth that he discovered shortly after the fire that the supporting joists of the first floor of the building were affected by termites, which destroyed its strength and power and caused it to collapse. The appellant was arrested shortly after December 19, 1936, the date of the collapse, but was not tried until June 16, 1937, so that the information upon which he now relies was available to him if reasonable diligence, which is the test, had been exercised, and cannot be strictly regarded as after-discovered evidence. The granting of a new trial is largely within the sound discretion of the learned court below, and the exercise thereof in refusing a new trial will not be reversed unless it has been clearly abused: *Weissbach et ux. v. Price*, 328 Pa. 46, 195 A. 21. We find no abuse here of judicial discretion.

A careful review of this record and a consideration of the able arguments of counsel fail to disclose any reversible error.

Judgment is affirmed, and it is ordered that the defendant appear in the court below at such time as he may there be called and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.