Opinion by
 

 Keller, P. J.,
 

 George R. McKee and Mrs. Alice McGann were killed in an automobile accident on West Liberty Avenue, near Cape May Avenue, Pittsburgh, on Thursday, December 10, 1936, at about 3:15 o’clock in the morning. They were riding in a Chevrolet coach with the defendant, Bartley J. Carroll, and a Mrs. Catherine Bert, .both of ¡whom were badly ¡injured in the accident. The car was being driven southwardly from Pittsburgh, in the direction of Dormont and Mt. Lebanon.
 

 Carroll was subsequently charged with involuntary manslaughter and true bills were returned on separate indictments — No. 41 for the death of McKee, and No. 42 for the death of Mrs. McGann. They were tried together and a verdict of guilty was rendered on each indictment. Concurrent identical sentences were imposed from which the defendant has appealed.
 

 The Commonwealth’s case rests on two propositions:
 

 (1) That at the time of the accident the car was being driven at an unlawful speed and in a reckless manner, as a result of which it collided with a telephone pole and upset, causing the death of McKee and Mrs. McGann; and (2) that Carroll, the defendant, was driving the car when the accident thus occurred.
 

 
 *359
 
 The appellant contends that the evidence in the case is insufficient to establish these propositions.
 

 We are of opinion that there was ample evidence to support both propositions and that the judgments should be affirmed.
 

 (1) As to the reckless and unlawful operation of the car the evidence of Officer Tanner was, in itself, sufficient to sustain the verdicts, and was not seriously weakened or contradicted.
 

 Tanner was a police officer employed by the County of Allegheny to patrol the Liberty Bridge and Tunnels. He used in his work a motorcycle with a side car. He came on duty at midnight of December 9th. The weather was clear, but the frost coming out of the ground had made the road “pretty slippery.” About 3:05 o’clock in the morning of December 10th, he saw the automobile, which figured in the fatal accident, going south on the Liberty Bridge, about 100 feet off the ramp of the Boulevard of the Allies. His attention was directed to it because of its zigzagging from one side of the road to the other and the speed at which it was going — from 45 to 50 miles an hour.
 
 [1]
 
 He started after it — when it was about 25 feet ahead of him — and his own speedometer showed he was going 45 to 50 miles an hour, but he did not gain on the car. There were some cars coming north to Pittsburgh, but no other cars going toward the tunnels. He tried to get up to the car before it got to the traffic signal at the north end of the Liberty Tunnels, but could not make it, and the car .started into the south-bound tunnel,
 
 [2]
 
 where it frequently swerved from one side of the road to the other. Tanner was going 50 miles per hour and
 
 *360
 
 the car ahead was going at least that fast, for he did not gain on it until he got to the south end of the tunnel, when he drew alongside, blew his whistle and called to the driver to pull over. Instead of doing so the driver turned his wheel towards the officer on his left and would have run him down, if the latter had not swerved or turned to the left to avoid being hit and, in doing so, stalled his motor. By this time the driver of the Chevrolet coach was out on West Liberty Avenue, and when Tanner got his motor started was at the intersection of West Liberty Avenue and Saw Mill Run Boulevard, about half a block ahead. Tanner followed, going for a while at 55 miles an hour, but at that speed, with the condition of the roadway, he could not control the wheels and had to slow down somewhat and the Chevrolet car kept gaining. Tanner could see its tail light, getting dimmer, until right above Cape May Avenue it skidded, turned twice completely around the roadway, sparks flew, and the car ran into a telephone pole, and came to rest facing towards Pittsburgh, with the top on the ground and the four wheels spinning in the air. McKee was lying dead, with his fractured head in the centre of the inbound (that is, northbound) street railway track and Mrs. Bert was lying between the car and the tubes. The other two were in the car — Carroll in the front or driver’s seat and Mrs. Me Gann in the back seat, but it was impossible to get them out until the car was righted. Tanner helped put McKee’s body into the car of a Western Union messenger, named Buckwalter, who came along and took it to Mercy Hospital, and assisted Gaus and Osterling to put Mrs. Bert in their car, and they took her to the hospital. He then left to telephone for help and was gone, possibly, ten minutes and when he got back, the car had been righted and Carroll and Mrs. McGann had been taken from it, the latter dead. Tanner took Carroll to the hospital in the side car of his motorcycle, and patrol wagon No. 9
 
 *361
 
 which came along took Mrs. McGann’s body to the hospital. Liberty Avenue there was 45 feet wide between curbs and was paved with asphalt, except for the two street car tracks, where the paving was of stone.
 

 Considering that 40 miles an hour was the maximum legal speed under the best road conditions, and that the slippery condition of the road required more care,
 
 [3]
 
 a speed of from 45 to 55 miles an hour, causing the car to swerve or zigzag from side to side and the refusal of the driver to slow up and pull over to one side, when ordered to do so, and his attempt to run the officer down instead, leave no doubt in our minds that the driver of the Chevrolet car was guilty of reckless conduct and wanton negligence amounting to an unlawful act, within the rule enunciated in
 
 Com. v. Gill,
 
 120 Pa. Superior Ct. 22, 182 A. 103, such as to justify his conviction of involuntary manslaughter, when the consequences of his reckless driving resulted in the death of two people.
 

 (2) We also think there was enough competent evidence that Carroll was the driver of the car to sustain his conviction. Admittedly he had borrowed the car from a man named Sam Crisanti, on Tuesday, December 8th, to attend a fireman’s funeral on Wednesday, December 9th; and he had been driving the car earlier the same evening. When the car first came onto the Liberty Bridge there were admittedly only four persons in it, Carroll, McKee, Mrs. Bert and Mrs. McGann. Going through the tunnel the tube was brightly lighted and when Tanner drew up alongside the Chevrolet car, while he did not recognize the faces of any of the occupants, he saw that the driver of the car, just to his
 
 *362
 
 right, wore a brown overcoat and had glasses on. To the driver’s right was a woman (Mrs. Bert). In the rear seat, back of the driver, was a woman (Mrs. Mc-Gann) and to her right, back of Mrs. Bert, was a man in a black overcoat. Carroll wore glasses. McKee did not. The attempt of Carroll’s daughter to lead the jury to believe that he only used glasses for reading and never otherwise was effectually refuted by his own testimony (p. 255) where he testified on direct examination as follows: “I use glasses for reading. Q. Do you use glasses any other time? A. Sometimes I do and sometimes I don’t.” He did not testify that he was not wearing glasses the night of the accident. On the other hand, the testimony was undisputed that McKee did not wear glasses at any time. When Tanner got to the scene of the accident almost immediately after its occurrence, the dead man, McKee, had on a black overcoat; and when Tanner returned from telephoning, he found that Carroll had been taken out of the overturned car, and was wearing a brown overcoat, and thus clothed he was taken by Tanner to the hospital. Osterling, who looked into the overturned car, before it was righted, said Carroll was pinned under the front seat on the driver’s side, between the seat and the roof of the car, with, the steering wheel above his legs, so that they could not pull him out, and that Mrs. McGann’s body was: in the back seat. The car was a coach, with only one door on each side, and going as they were when Tanner was chasing after them it would have been impossible for Carroll and McKee to have exchanged overcoats or positions without stopping the car, which was not done. It traveled continuously at this unlawful speed, especially dangerous in view of the surface conditions, until the final skidding, turning around and over and colliding with the pole. Furthermore Carroll himself, who took the witness stand in his own behalf, did not testify he was not wearing a brown overcoat that night. His
 
 *363
 
 daughter, who had no means of knowing what he wore at the time of the accident or how he was dressed when he was brought to the hospital, for she was not there then, did not hesitate to deny that he ever owned a brown overcoat and produced an overcoat which she said she took away with her from the hospital, but just as in regard to his use of glasses, she was not as careful in her testimony as he was. Tanner frankly stated that he could not recognize the driver’s face for it was not turned towards him while he was alongside; and when he took Carroll to the hospital the latter’s face was badly cut and bleeding. But this was not a case of identifying a face. Admittedly, either Carroll or McKee was the driver — no one else. Both McKee’s sister and his fiancee testified that he did not drive a car. He never wore glasses and he was wearing a black overcoat when found dead in the roadway, corresponding to the clothing worn! by the man in the back seat when Tanner saw him only a few seconds before the accident.
 

 In view of all these circumstances, the jury would be justified in finding from the evidence in the case that the car, at the time of the reckless journey over the bridge, through the tunnel and on West Liberty Avenue up to the accident or collision, was being driven by a man wearing glasses, who had a brown overcoat on; that McKee, the only other man in the car, was sitting in the back seat wearing a black overcoat, and that Carroll, dressed in a brown overcoat and wearing glasses, was driving the car, and that so dressed he was taken, injured and bleeding, to the hospital by Officer Tanner in the side-car of Ms motorcycle. If the jury believed this testimony Carroll’s identity as the driver was established. It was not necessary to identify his face. Cases dealing with the identification of faces have little application here. According to the defendant’s own story, the driver of the car must have been Carroll, if it was not McKee, and the circumstances, as testified
 
 *364
 
 to by the Commonwealth’s witnesses — and their story was believed by the jury — leave no doubt in our mind that Carroll was the driver and that McKee dressed as he was when found dead in the roadway, occupied the back seat with Mrs. McGann.
 

 It is not necessary to discuss in detail all the assignments of error which the appellant has presented under his uninforming statement of questions involved. We have considered them all and find no reversible error. The charge of the court was not inadequate, but, on the contrary, presented fully and fairly the issues of fact to be passed upon by the jury and correctly stated the law applicable to the facts as found.
 

 No error was committed by the court in instructing the jury that the two cases were identical and that if the defendant was guilty in the one case, he would be guilty in the other; and if not guilty in the one case, he would not be guilty in the other; for the same unlawful act or acts resulted in the death of both McKee and Mrs. McGann, alike, and by reason of this fact the imposition of double or consecutive sentences would have been improper
 
 (Com. v. Ernesto,
 
 93 Pa. Superior Ct. 339;
 
 Com. v. Veley,
 
 63 Pa. Superior Ct. 489). As was said by our Brother Cunningham in the Ernesto case, p. 348: “The same unlawful act which caused the death of any one of the persons mentioned in the indictment caused the deaths of the others. There was but one injury to the Commonwealth involved in this prosecution and that neither a malicious nor an intentional one in so far as its unfortunate results are concerned.” It should make no difference whether there are separate indictments or separate counts in the same indictment. The gist of the offense is the unlawful act, done without malice or intention to injure, resulting in death.
 

 The court in instructing the jury as to the ingredients of the offense, followed the opinion of this court
 
 *365
 
 in
 
 Com. v. Gill,
 
 supra. We find no error in it on that score.
 

 The district attorney called Mrs. Bert as a witness for the Commonwealth. As a survivor of the tragedy she was very properly called:
 
 Rice v.
 
 Com., 102 Pa. 408, 411. But she testified that she had no recollection whatever of the events of the evening, or even of conversations that she had relative to the accident in the hospital during her convalescence. It was proper then, and eminently fair, to call the physician who attended her, who testified that the natural result of her injuries —which were to her head — would be a loss of memory as to the occurrence. Otherwise the jury might have wrongly concluded that she was trying to shield the defendant.
 

 The objections to the cross-examination of Sam Wax and William S. Swogger, witnesses for the defense, are likewise without merit. Wax, who was a constable at the time of the trial, testified that the defendant had gone with him, as a sort of character witness (he said), on the night of December 9th to meet certain other persons influential in politics, to help secure his appointment as a deputy constable, and had been with him about two hours that night, — differing from some witnesses for the Commonwealth as to defendant’s whereabouts during that time — and further testified that as the party— then consisting (he said) of five persons, including John McKee, George’s brother, who was intoxicated and being taken home — left Henry’s Cafe, about 1:35 A. M. George McKee was driving the car. On cross-examination the Commonwealth was permitted to bring out that the defendant, Carroll, and Walter Smith, whom they had gone to see, were political leaders of the fifth ward, Wax’s ward. The only objection to the questioning was that it was not cross-examination. It related back to the witness’s testimony in chief respecting the purpose of the visit, and it was relevant as showing the relation
 
 *366
 
 between the parties. Swogger, who said he appeared as a volunteer witness for the defense, testified that he saw the wrecked car shortly after the accident, and that, differing from the photograph offered in evidence by the Commonwealth, the top was not caved in and the right hand door was not off. He also testified that he helped to hold the car up, while a man and a woman were being taken out of it and that the man’s body was lying “in the rear of the machine on the roof” and the woman was in the other corner. He stated that he had gone to the fire engine house in Brookline and asked the firemen where Carroll lived. Carroll was a fire captain in the City of Pittsburgh and had been for a number of years. The District Attorney asked Swogger on cross-examination if he was related to a fire captain or former fire captain and he said his brother-in-law was a fireman. We find no error in this. The Commonwealth may show by cross-examination matters bearing on the witness’s bias or feeling, as affecting his credibility. ‘Whatever tends to show the interest or feeling of a witness in a cause is competent by way of cross-examination:”
 
 Com. v. Farrell, 187
 
 Pa. 408, 423, 41 A. 382;
 
 Com. v. Emmett,
 
 74 Pa. Superior Ct. 86, 90;
 
 Com. v. Norris,
 
 87 Pa. Superior Ct. 66, 71;
 
 Ott v. Houghton,
 
 30 Pa. 451;
 
 Lenahan v. Pittston Coal Co.,
 
 221 Pa. 626, 629, 70 A. 884;
 
 Hopkinson v. Leeds,
 
 78 Pa. 396, 400. The latitude allowed in cross-examination is largely in the discretion of the trial court:
 
 Com. v. Delfino,
 
 259 Pa. 272, 102 A. 949;
 
 Com. v. Keegan,
 
 70 Pa. Superior Ct. 436, 441; and we do not think it was abused here.
 

 The assignments of error are overruled. The judgments are affirmed and the record is ordered remitted to the court below; and it is ordered that the defendant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with the sentence, or any part of
 
 *367
 
 it, which had not been performed at the time the appeals in this case were made a supersedeas.
 

 [1]
 

 The maximum legal speed at the time was 40 miles per hour. Act of May 1, 1929, P. L. 905, sec. 1002 (b) 4, 75 PS see. 501 (b) 4.
 

 [2]
 

 One tunnel is northbound and the other southbound. Each is for one-way traffic.
 

 [3]
 

 “Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed, not greater......than is reasonable and proper, having due regard to the traffic,
 
 surface,
 
 and width of the highway and of any other......conditions then and there existing.” Sec. 1002(a) of Act of May 1, 1929, supra.